THIRD DIVISION
October 17, 2007

No. 1-06-1276

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03CR16347 |
| | ) | |
| ROMARIS WALTON, | ) | The Honorable |
| | ) | Christopher J. Donnelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Romaris Walton was convicted of two counts of first degree murder and sentenced to 32 years' imprisonment. On appeal, defendant asserts that (1) he was denied effective assistance of counsel and due process of law when trial counsel usurped his right to decide whether to seek a conviction on the lesser mitigated offense of second degree murder, and instead proceeded with an all-or-nothing defense; and (2) his second conviction for first degree murder must be vacated because it violates the one-act, one-crime doctrine. We affirm as modified.

Defendant was charged with intentional murder (720 ILCS 5/9-1(a)(1) (West 2002)) and knowing murder (720 ILCS 5/9-1(a)(2) (West 2002)) in connection with the stabbing death of Kenneth Taylor on July 9, 2003. Defendant waived his right to a jury trial and elected a bench trial, where he advanced the theory of self-defense.

The following evidence was adduced at defendant's bench trial. Johnnie Brown testified that on July 7, 2003, she met defendant, who introduced himself as "William," and learned that

he needed a place to stay. At the time, she was living with Taylor, her common law husband, in a two-bedroom apartment located at 14516 Muskegon in Burnham, Illinois. Brown and Taylor agreed to permit defendant to stay with them, and defendant moved in that day.

On July 9, 2003, defendant returned to Brown and Taylor's apartment from a nearby construction site. Brown let him in and then joined Taylor in their bedroom. She went to check on defendant shortly thereafter and discovered that he was smoking crack cocaine in the living room. Brown had seen defendant use drugs in her apartment before and asked him not to bring drugs into her apartment. This time, Brown ordered defendant to leave the apartment and he complied.

Shortly thereafter, Brown left the apartment to go to the store. Taylor remained in the apartment. When Brown returned to the apartment later that evening, she found that all of the lights were turned off and a sheet was covering the window. There were also bloodstains on the walls and floors throughout the apartment. She looked for Taylor and ultimately found him lying motionless on the floor in the bedroom. Because she did not have a phone in her apartment, Brown ran to a neighbor's apartment to call the police.

Brown acknowledged that during her 12-year relationship with Taylor, he had physically abused her on a number of occasions. She called the police at least four times, and the police filed charges against Taylor. Each time, however, the charges were dropped. On no occasion had Taylor ever "pulled a knife" on her.

Doctor Scott Denton, a forensic pathologist and the deputy chief medical examiner at the Cook County medical examiner's officer, performed an autopsy on Taylor and discovered

approximately 90 stab wounds on his body. The majority of the wounds were superficial; however, "some of them were pretty deep." There were multiple wounds to Taylor's head, neck, and upper back, which were consistent with someone stabbing Taylor from above. In addition, some of the wounds were inflicted horizontally, while others were inflicted vertically, indicating movement between the victim and the assailant. Denton classified Taylor's death as a homicide. In addition, Denton testified that a toxicology report revealed that Taylor's blood contained carbon monoxide, which is common in smokers, as well as a cocaine breakdown product.

Sergeant John Daley was on patrol duty on July 9, 2003. He received a call shortly after 7:30 p.m. and was directed to 14516 Muskegon, apartment 2-C. Upon entering the apartment, he found Johnnie Brown, sitting in a chair, screaming and crying. He also found blood "everywhere," including the floor, walls, carpet, and blinds. Sergeant Daley also discovered Taylor's body on the bedroom floor. He approached the body and found "absolutely no signs of life."

After securing the scene, Sergeant Daley, along with another officer, walked outside the residence. In the rear of the property, they recovered a bag containing bloody clothing and shoes from the Dumpster. The parties stipulated that the blood on the shoe was compared to a blood sample taken from Taylor and was found to be "consistent with [Taylor's] DNA profile."

Sergeant Kevin Urbanek was assigned to the tactical division on July 9, 2003. At approximately 7:36 p.m., he was directed to pick up a carjacking victim from St. Margaret's Hospital. He met with defendant and interviewed him at the police department. Defendant identified himself as "Kingsley Lemon" and informed Sergeant Urbanek that he had been

approached by two males who "pulled a weapon on him" because defendant owed one of the men money. The assailants ordered defendant to take off his clothes and defendant complied. The two men then drove off in his vehicle and defendant ran away until he collapsed on the lawn of a residence located at 1075 Breclaw Drive. Following defendant's narrative, Sergeant Urbanek wrote a report concerning the incident, and defendant signed the report, verifying its authenticity.

On July 9, 2003, Detective Paul Hurckes was assigned to investigate Taylor's homicide. In connection with the assignment, he interviewed defendant at approximately 11:15 p.m. Defendant did not identify himself as Romaris Walton, but provided a different name. Defendant initially informed Detective Hurckes that he had been carjacked, but later confessed he had been involved in the stabbing death of Taylor. Detective Hurckes informed defendant of his rights and defendant signed a preprinted form indicating he understood his rights. Defendant subsequently informed Detective Hurckes that his real name was Romaris Walton.

Detective Hurckes interviewed defendant again the following day at approximately 11:06 a.m. Following the interview, Detective Hurckes took defendant to the 2700 block of Goodrich to recover the knife defendant used in the stabbing. He found the knife in the place indicated by defendant. The parties stipulated that the knife contained a bloodstain, which was compared to a blood sample taken from Taylor. The bloodstain on the knife was found to be "consistent" with Taylor's DNA profile.

On July 11, 2003, Assistant State's Attorney (ASA) Tim Felgenhauer, a member of the felony review team, met with Detective Hurckes, who informed him about the stabbing. He

interviewed Brown and then went to speak with defendant. ASA Felgenhauer introduced himself and informed defendant of his <u>Miranda</u> rights from a preprinted form. Defendant acknowledged his rights, provided his initials beside each right, signed the form, and agreed to discuss his role in Taylor's death. After concluding the interview, ASA Felgenhauer asked defendant if he would be willing to memorialize his statement on videotape. Defendant agreed and signed a "Consent to Videotape Statement" form.

In his videotaped confession, defendant stated that on July 9, 2003, he was living with Johnnie Brown, whom he called "J," and Kenneth Taylor, who he referred to as "Kenny," in their apartment located at 14516 Muskegan. At approximately 6:30 p.m., he and Kenny engaged in a dispute about rent money. Defendant attempted to leave the apartment at approximately 7 p.m., but Kenny stood in front of the apartment's front door, blocking the exit, while holding a knife in his right hand. Defendant approached Kenny and grabbed his wrist, causing the knife to fall to the ground. Defendant and Kenny both fell to the ground to retrieve the knife. Defendant recovered the knife with his right hand and both men stood up. Defendant held the knife out in front of him with the blade facing outward. Kenny attempted to grab the knife and defendant "poked him," stabbing Kenny in his neck. Defendant stepped back, but Kenny "charged towards" him. Defendant "poked" Kenny again, stabbing him "[a] few times" in his neck and chest. The two then began to "tussle," and Kenny again attempted to take the knife. Defendant stabbed one of Kenny's hands and then stabbed him "harder"on the side of his neck. Kenny then broke free and ran toward the glass patio doors and tried to run through the glass doors, causing the sheet covering the doors and the blinds to fall to the ground. Defendant didn't want Kenny to

"throw hisself [sic] out the *** glass doors," so he grabbed Kenny by the shirt and put him against a wall. Defendant was in a "frozen state" because he was "shocked at what had took [sic] place." He retrieved the sheet that had fallen to the floor and hung the sheet back over the doors. As he was doing so, he heard a noise, glanced over and saw Kenny moving toward the kitchen where defendant had left the knife.

Defendant beat Kenny to the knife, grabbed it with his right hand, and pointed the blade toward the ground. Kenny fell to his knees and "latched his arms around [defendant's] waist real tightly." Defendant attempted to loosen Kenny's grip but was unable to firmly grasp him because Kenny was covered in blood. Defendant was also losing his footing, slipping on the blood that covered the floor, "so in a paranoid reaction, [he] started sticking him again" in an attempt to get Kenny off of him. Defendant stabbed Kenny "over a dozen" times in his back, shoulder, and the side of his neck. Ultimately Kenny fell over and defendant "stood motionless for a minute" to determine "what was gonna be [his] next move." He then noticed Kenny crawling toward the bedroom. Defendant thought Kenny may have been trying to get a gun or a weapon from the bedroom so he walked ahead of Kenny to the room, but did not see a weapon. When he turned around, he saw Kenny collapse in the hallway. Defendant knew Kenny was no longer a threat and started "making plans to leave." Defendant removed his clothes and put them in a garbage bag. He washed the blood off of his face and hands and changed into some new clothes. He covered the floor in the front room with a sheet because it was covered in blood and was a "gruesome sight." He did not want J "to see that and panic." Defendant also dragged Kenny's body to the bedroom to remove him from "the line of sight for anybody that did come

through the door so they wouldn't panic."

Defendant subsequently left the apartment, deposited the bag containing the bloody clothes in a Dumpster, and threw the knife in some weeds. He then sat down to "collect [his] thoughts," and noticed that there was some blood on his pants. That gave him an "uncomfortable feeling" so he removed his pants and underwear, wrapped them in a towel and left them on the ground. He walked down an alley and saw a young man. He "made up a story that [he] got carjacked and some guys had jumped [him]" and asked the man to call the police. Defendant walked to the corner of the block, sat down, and noticed his shoes also had blood on them. He removed them and "throwed [sic] them in a yard." After 5 or 10 minutes, the police had not arrived so defendant approached another group of people, "told them the same story that [he] had been carjacked" and asked them to call the police. The police arrived shortly thereafter and defendant provided them with a false name because he knew there was a warrant out for his arrest under his real name, and informed them he had been carjacked. Defendant was examined at the hospital and was then taken to the police station where he initially provided the police with details about the fake carjacking. However, he began to feel "at ease" and began to tell the truth about his involvement in Kenny's death. Defendant directed the police to the Dumpster that contained his bloody clothes and to the knife.

At the conclusion of the State's case, the defense moved for an acquittal. Counsel argued that "this is a case of self-defense." He argued defendant never had an intent to kill Taylor. He never stabbed Taylor in any of his vital organs and most of the stab wounds were in fact superficial. Defendant's statement showed he repeatedly backed away from Taylor, but Taylor

advanced toward him. Accordingly, defendant clearly "acted in self-defense." The trial court denied defendant's motion and both parties proceeded with closing arguments.

Defense counsel adopted his argument from his motion for an acquittal. He reiterated that the physical evidence as well as defendant's statement showed he acted in self-defense when he stabbed Taylor, a man who had a history of violence. Finally counsel advised the court that "if we were in front of a jury, we would not be going all or nothing, Judge. Most decidedly we would ask for a second degree instruction if we were in front of a jury." However, because the evidence showed defendant acted reasonably, counsel asked for a finding of not guilty.

Following closing arguments, the court discussed the relevant facts and concluded that "[t]he defendant's story makes no sense whatsoever." Based on defendant's actions and his confession, the court found that "[a]ll these things are not self-defense. All of these things are not second degree murder. All of these things are first degree murder, and I so find." The trial court found defendant guilty of two counts of first degree murder and sentenced him to 32 years' imprisonment. Defendant's timely appeal followed.

On appeal, defendant first asserts that he was denied his constitutional right to effective assistance of counsel when his trial counsel opted to pursue an all-or-nothing trial strategy and asked the trial court not to consider the lesser mitigated offense of second degree murder, thus usurping his right to decide whether to seek a conviction on this lesser offense. In a related claim, defendant also asserts that the trial court denied defendant his due process rights when it failed to inquire whether he knowingly and intelligently decided to forgo a second degree murder conviction. The State, on the other hand, asserts that defendant's claim is contradicted by the

record and that his argument is flawed because he relies on a body of case law developed specifically for jury trials, which has no applicability to bench trials.

Initially, we address the State's argument that the record contradicts defendant's claim that counsel requested the court not to consider the lesser mitigated offense of second degree murder and that his request demonstrated that he alone made the decision to advance an all-or-nothing defense at trial. At trial, during closing arguments, defense counsel advised the court:

"Judge, if we were in front of a jury, we would not be going all or nothing, Judge. Most decidedly we would ask for a second degree instruction if we were in front of a jury, Judge. But I feel that the evidence here, Judge, shows that he did act reasonably, this was self-defense. We are asking you to find him not guilty, Judge.

I know you know what your options are at this point in terms of a finding. We are asking for finding of not guilty. We truly feel when looked upon, the evidence shows that this was reasonable and we're asking you to find Romaris not guilty."

While we agree with defendant that counsel clearly expressed an intention to advance an all-or-nothing strategy at defendant's bench trial, we disagree that counsel's soliloquy "demonstrates that trial counsel–and not [defendant]–made the decision to proceed on an all-or-nothing theory instead of offering the trial court the option of convicting [defendant] on the lesser mitigated

9

offense as a matter of trial strategy" as defendant claims. Though counsel indicates at one point that he alone ("I") felt the evidence showed defendant acted reasonably in self-defense, he later stated: "We truly feel when looked upon, the evidence shows that this was reasonable and we're asking you to find Romaris not guilty." Accordingly, counsel's statement can justifiably be interpreted as an indication that counsel and defendant collectively agreed on the all-or-nothing defense strategy. However, assuming, arguendo, that counsel's statement could be interpreted in the manner urged by defendant on appeal, we nonetheless find that defendant was not denied effective assistance of counsel or due process.

A criminal defendant has a constitutional right to receive effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8. To establish a violation of his constitutional right to effective assistance of counsel a defendant must show that (1) counsel's performance was objectively unreasonable and (2) resulted in prejudice to defendant. Strickland v. Washington, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984); People v. Albanese, 104 Ill. 2d 504, 525-26 (1984). It is incumbent upon a defendant to satisfy both prongs of the Strickland test. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; People v. Patterson, 217 Ill. 2d 407, 438 (2005). To satisfy the first prong, the defendant must overcome the "strong presumption" that counsel's performance was a matter of sound trial strategy. Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; People v. Perry, 224 Ill. 2d 312, 341-42 (2007). To satisfy the prejudice prong, the defendant must prove that a reasonable probability exists, that but for counsel's unreasonable performance, the trial result would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S.

Ct. at 2068; People v. Johnson, 218 Ill. 2d 125, 143-44 (2005).

Our supreme court has recognized that a criminal defendant who elects a jury trial has the right to decide whether to tender a lesser-included offense jury instruction. People v. Brocksmith, 162 Ill. 2d 224, 229-30 (1994); People v. Medina, 221 Ill. 2d 394, 404-05 (2006). The rationale for this rule is that the defendant tendering a lesser-included offense "expos[es] himself to potential criminal liability, which he otherwise might avoid if neither the trial judge nor the prosecutor seeks the pertinent instruction." Medina, 221 Ill. 2d at 405. Accordingly, when defense counsel tenders a lesser-included offense jury instruction, the trial court "should conduct an inquiry of defense counsel, in defendant's presence, to determine whether counsel has advised defendant of the potential penalties associated with the lesser-included offense, and the court should thereafter ask defendant whether he agrees with the tender." Medina, 221 Ill. 2d at 409. No such inquiry is required if no lesser-included instruction is tendered, however, because "it may be assumed that the decision not to tender was defendant's, after due consultation with counsel." Medina, 221 Ill. 2d at 410. Relying on Medina and Brocksmith, defendant asserts that it necessarily follows that in a bench trial, a criminal defendant, charged with murder, has the exclusive right to decide whether to seek conviction on the lesser mitigated offense of second degree murder, and that when counsel advances an all-or-nothing defense, the trial court must inquire whether defendant agrees with that defense. We disagree.

Defendant's position ignores an important distinction between jury trials and bench trials as well as the rationale for the aforementioned rule. In a jury trial, unless a lesser-included offense instruction is tendered, the jury does not have the option to convict the defendant of an

11

uncharged lesser-included offense; rather, the jury will be forced to decide either to convict or acquit him. This avoids the possibility of a compromise verdict where the "jury may be induced to find defendant guilty of the lesser offense rather than to continue the debate as to his innocence." People v. Benford, 349 Ill. App. 3d 721, 728 (2004). In contrast, a judge presiding over a bench trial may convict a criminal defendant of an uncharged lesser-included offense sua sponte. People v. Moore, 358 Ill. App. 3d 683, 690 (2005), citing People v. Knaff, 196 Ill. 2d 460, 473 (2001).

Accordingly, we have recognized that the rule established in Brocksmith has "limited application" because "[i]n a bench trial, a judge determines from the evidence whether the defendant is guilty of murder or of some lesser-included offense." People v. Turner, 337 Ill. App. 3d 80, 90 (2003). Though defendant correctly notes that second degree murder is properly characterized as a lesser mitigated offense rather than a lesser-included offense (People v. Jeffries, 164 Ill. 2d 104, 122 (1995)), we have found that the trial court may also convict a defendant of second degree murder sua sponte. See People v. Rogers, 286 Ill. App. 3d 825, 829-30 (1997) (upholding the trial court's sua sponte finding that the defendant was guilty of the uncharged lesser mitigated offense of second degree murder even though defendant, at trial, denied any involvement in the shooting). Accordingly, the rationale for the Brocksmith rule and the inquiry procedure developed by Medina do not have the same applicability in a bench trial. Thus, we do not find that counsel usurped one of defendant's fundamental rights, thereby rendering ineffective assistance, or that the trial court violated his due process rights by failing to inquire into his trial strategy.

Instead, we find that defendant's appeal essentially challenges his counsel's trial strategy. Counsel's trial strategy, however, is "virtually unchallengeable" and will generally not support an ineffective assistance of counsel claim. People v. Palmer, 162 Ill. 2d 465, 476 (1994); see also People v. Ramey, 152 Ill. 2d 41, 53-56 (1992); People v. Bobo, No. 1-05-2510 (August 24, 2007). Counsel's decision to advance an "all-or-nothing defense" has been recognized as a valid trial strategy (People v. Barnard, 104 Ill. 2d 218, 231-32 (1984); Benford, 349 Ill. App. 3d at 728-29; People v. Daniels, 331 Ill. App. 3d 380, 392-93 (2002)) and is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law. See, e.g., People v. Lemke, 349 Ill. App. 3d 391, 399-402 (2004). In this case, counsel adopted a valid trial strategy when he argued that defendant was acting in self-defense. The mere fact that this strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance. People v. Milton, 354 Ill. App. 3d 283, 290 (2004) ("Counsel's choice [of defense theory] does not constitute ineffective assistance of counsel simply because it was unsuccessful.")

We turn next to the prejudice prong. We note initially that defendant asserts that he need not meet the prejudice prong because prejudice may be presumed in his case. Defendant bases his argument on his belief that criminal defendants have a fundamental right in a bench trial to decide whether to permit the trial court to consider the possibility of convicting them of a lesser mitigated offense. He cites several cases which have recognized that in certain, limited circumstances, prejudice will be presumed when counsel interferes with the defendant's exercise of a fundamental right. See, e.g., People v. Swanson, 276 Ill. App. 3d 130, 132-33 (1995)

13

(prejudice will be presumed when court-appointed appellate counsel fails to file a notice of appeal and deprives the defendant of his fundamental right to a direct appeal). However, because we have decided that defendant's claim does not involve a violation of a fundamental right but, rather, is an attack on counsel's trial strategy, we will not indulge in a presumption of prejudice.

In this case, we conclude that defendant suffered no prejudice. It is clear from the record that the trial court did, in fact, consider second degree murder, when it stated: "All of these things are not self-defense. All of these things are not *second degree* murder. All of these things are first degree murder, and I so find." (Emphasis added.) Thus, there is no reasonable probability that, had counsel argued in favor of a second degree murder conviction, the trial result would have differed. Accordingly, because counsel did not act unreasonably and defendant suffered no prejudice, his ineffective assistance of counsel claim has no merit.

Next, defendant asserts, and the State concedes, that the trial court erroneously sentenced him to two counts of first degree murder in violation of the one-act, one-crime doctrine. Defendant maintains that we should vacate his murder conviction under count II because it contains the less culpable mental state.

The law is clear that in criminal cases, the one-act, one-crime doctrine prohibits the imposition of multiple convictions based upon a single act and provides that only a conviction for the most serious offense may be sustained. See People v. King, 66 Ill. 2d 551, 566 (1977); People v. Pearson, 331 Ill. App. 3d 312, 321-22 (2002). As a rule, "[a] defendant cannot be convicted of more than one murder arising out of the same physical act." People v. Pitsonbarger, 142 Ill. 2d 353, 377 (1990).

1-06-1276

In this case, defendant was charged with, and convicted of, intentional murder (720 ILCS 5/9-1(a)(1) (West 2002)) (count I) and knowing murder (720 ILCS 5/9-1(a)(2) (West 2002)) (count II). Because there was only one person murdered, his dual convictions cannot stand. Pitsonbarger, 142 Ill. 2d at 378; People v. Foreman, 361 Ill. App. 3d 136, 155-56 (2005). Accordingly, because intentional murder involves a more culpable mental state, we vacate his conviction for knowing murder, the less serious offense. Pitsonbarger, 142 Ill. 2d at 378; Foreman, 361 Ill. App. 3d at 155-56.

Affirmed as modified.

QUINN, P.J., and THEIS, J., concur.

15