# Illinois Official Reports

## Appellate Court

<div style="border">

### *People v. Neasom*, 2017 IL App (1st) 143875

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL NEASOM, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3875 |
| Filed<br>Rehearing denied | September 15, 2017<br>October 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-8303; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justices Gordon and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant Daniel Neasom was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and sentenced to 27 years' imprisonment. Defendant appeals his conviction, arguing that his trial counsel was ineffective for failing to advance a theory of second degree murder. Defendant also contends that his 27-year prison sentence is excessive. For the reasons set forth herein, we affirm the judgment of the trial court.

¶ 2        Defendant was charged with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)). Defendant waived his right to a jury trial and, on July 29, 2014, the case proceeded to a bench trial.

¶ 3        At trial, Calvin Sperling testified that, on the morning of July 23, 2011, he and his co-worker Jonathan Schutt were traveling southbound on South Kedzie Avenue after leaving a worksite. As he drove his truck through the 5800 block of South Kedzie, Sperling heard the sound of breaking glass and a woman's voice screaming for help. Schutt, who was a passenger in Sperling's vehicle, stuck his head out of the truck's window and informed Sperling that a woman was hanging out of the window of a nearby building. Seconds later, Schutt exclaimed, "Oh, my god, she just fell from the window." Sperling called 911 to report the incident and drove his vehicle to an area one block north of the scene to wait for the police to arrive.

¶ 4        When the police arrived, Sperling and Schutt told officers what they had observed. As Sperling was speaking to police officers, he observed a man climb out of a window located above the woman's body. The man was hanging from a ledge and attempted to scale the wall "as if he was Spiderman." The man lost his grip and fell backward onto the sidewalk below. On cross-examination, Sperling explained that he did not observe the woman hanging out of the window but did hear the glass break and woman scream.

¶ 5        Schutt testified that on that morning he left a worksite at the intersection of 55th Street and South Kedzie Avenue with Calvin Sperling. As they were traveling in the 5800 block of South Kedzie, Sperling told Schutt that he heard the sound of breaking glass, and Schutt stuck his head out of the passenger side window to investigate the sound. Schutt noticed broken glass on the sidewalk outside an apartment building. He looked up and observed a woman hanging headfirst out of a window. The woman's upper torso was completely out of the window, her arms were flailing, and she was screaming for help. Ten to fifteen seconds later, Schutt observed the woman fall from the window and land head-first on the sidewalk. Schutt told Sperling to call 911, and Sperling drove his truck to a location just north of the scene.

¶ 6        When police arrived at the scene, Sperling and Schutt approached the officers and described the incident. Schutt then observed a man hanging from the window out of which the woman had fallen. Schutt turned away because he did not want to see another person fall from the building, but he heard the sound of the man hitting the ground.

¶ 7        On cross-examination, Schutt admitted that he did not observe anyone push the woman out of the window and did not observe anyone else near the window at that time.

¶ 8        Michael Divorski testified that he was the brother of the woman who had fallen out of the window, whom he identified as Cynthia Barnes. Divorski talked to Barnes the night before

her death. Barnes was homeless at the time and told Divorski that she was going to try to find somewhere to stay that night because it was raining.

¶ 9    Officer Hector Fuentes testified that, on July 23, 2011, he was conducting routine patrol with his partner Officer Peter Gurskis. At 5:17 a.m., the officers received a "person down" call at the location at South Kedzie Avenue. When they arrived on the scene, Fuentes observed the body of a female, whom Gurskis recognized as Cynthia Barnes, lying on the ground, surrounded by broken glass. Her body was located in front of an apartment building with retail units on the first floor. Fuentes looked up and observed a shattered window on the third floor, directly above the body. He could hear someone moving around inside the apartment building. He remained on the sidewalk while Gurskis went inside the building to investigate. Moments later, fire department personnel followed Gurskis into the building with a sledgehammer.

¶ 10    Fuentes could hear Gurskis and fire department personnel using the sledgehammer. He then heard glass shatter, and looked up to observe defendant shattering a window with a clothes iron. Defendant, who was not wearing any clothes, exited the building through the window. Fuentes shouted at defendant, telling him to go back inside the building, and defendant climbed back through the window. A few seconds later, defendant climbed out of the previously shattered window directly above the body. Defendant was wearing a pair of sweat pants, and he attempted to climb down the building wall. Fuentes observed defendant fall from the wall, and land head-first on the sidewalk. Paramedics rushed to assist defendant, placed him on a stretcher, and placed him inside an ambulance.

¶ 11    Officer Fuentes heard the paramedics calling for help from inside the ambulance. He ran to the ambulance and observed defendant flailing his arms and trying to get off the stretcher. Fuentes assisted in holding defendant down while the paramedics restrained him. The paramedics then transported defendant to a hospital.

¶ 12    Officer Gurskis testified that he and Officer Fuentes were on routine patrol on July 23, 2011, when they received a "woman down" call and drove to South Kedzie Avenue. There, Gurskis observed the body of Cynthia Barnes lying on the sidewalk in front of an apartment building. She had blood in her hair and was surrounded by broken glass. Gurskis looked up and observed a broken window on the third floor of the building. He entered the building and attempted to enter apartment 304, but the door was locked. He could hear someone walking on the wooden floor of the apartment. After attempts to kick in the door failed, Gurskis called for the fire department to come to the apartment with tools to open the door.

¶ 13    Fire department personnel arrived at the apartment door with a sledgehammer and a prying tool. When the door was opened, the responders had to move a refrigerator that had been placed in front of the door. Gurskis described the apartment as "in complete disarray," with blood all over the apartment and broken glass near the windows. After observing that nobody was in the immediate living area, Gurskis headed toward an area of the apartment where a door had been barricaded by a box spring and bed frame. After removing the barricades, he entered a bedroom, where he observed two windows, one of which was broken. The broken window had blood on it and was situated directly above the victim's body. After finding a large knife with blood on it, Gurskis left the apartment and drove to the hospital where paramedics had taken defendant. Two days later, on July 25, 2011, Gurskis arrested defendant at the hospital. Defendant was released without being charged, but was rearrested after DNA and toxicology tests were completed.

¶ 14    Detective Keith Smith testified he arrived at South Kedzie Avenue to investigate the death of Cynthia Barnes. When he arrived, Barnes's body was still lying on the sidewalk. While walking through the apartment, he noticed that the bedroom had two windows, one of which was broken and situated directly above Barnes's body.

¶ 15    Doctor Adrienne Segovia testified that she was an assistant Cook County medical examiner and had conducted the autopsy of Cynthia Barnes. Segovia detailed numerous external injuries that Barnes had sustained and classified them as sharp force injuries, blunt force injuries, and injuries that had characteristics of both blunt and sharp force trauma. Notable sharp force injuries were consistent with injuries inflicted by glass and included a cut on the top of Barnes's head and incised wounds on her face, left forearm, left wrist, left hand, and left thigh. Notable blunt force injuries included a star shaped wound on the top of Barnes's head, lacerations on the inside of her lips, bleeding of her left eye and ear, and bruises and scrapes on her face, neck, chest, abdomen, arms, legs, and feet.

¶ 16    Regarding internal injuries, Dr. Segovia detailed hemorrhages, a broken sternum, broken ribs, dislocation and fracturing of the spine, and a fractured skull. Dr. Segovia determined that the cause of death was multiple injuries due to a fall from a significant height. She also concluded that the manner of death was homicide.

¶ 17    On cross-examination, Dr. Segovia testified that she based her initial opinion regarding the manner of death on information that she had at the time. Specifically, she based her opinion on the fact that the apartment had been barricaded, the fact that there was a knife in the apartment, and the fact that Barnes fell out of a window. She learned this information by viewing a police report and photographs taken by one of the medical examiner's investigators.

¶ 18    On April 10, 2014, Dr. Segovia met with defendant's counsel and another assistant public defender and viewed photographs of the crime scene taken by the Chicago police department. She had not viewed these photographs before she rendered her opinion as to the manner of death on July 31, 2011. The photographs were marked as exhibits and shown to Dr. Segovia at trial.

¶ 19    Dr. Segovia testified that the photographs showed the apartment "in disarray," a broken apartment door, the outside of the apartment door marked with blood, and a knife that was found inside the apartment. Based on these photographs, Dr. Segovia opined that Barnes was not barricaded in the apartment.

¶ 20    Dr. Segovia also reviewed an Illinois State Police lab report, which indicated that two DNA profiles were found on the blade of the knife, from which Barnes could not be excluded. The report also indicated that the DNA profile found on the handle of the knife matched Barnes. This information, paired with photographs of defendant appearing to show that he had been stabbed in the thigh two times, led Dr. Segovia to reevaluate the cause of the cuts on Barnes's hand. Instead of being cut by glass, it was possible that Barnes's hand was cut when the handle of the knife slipped out of her hand.

¶ 21    Defense counsel introduced a photograph, taken from outside the apartment building, which showed three windows situated above a sign that was anchored to the building. Dr. Segovia testified that the left-most window in the picture was closed. The window in the middle of the group appeared to be open and was situated directly above the sign hanging from the building. The window on the right was broken, and a clothes iron sat on the window sill. This photograph matched other photos depicting the crime scene, which showed that a

fourth window had also been broken. The fourth window was separate from and situated to the right of the three windows.

¶ 22    Based on this new evidence, which she had not considered before, Dr. Segovia changed her opinion as to manner of death from homicide to undetermined. When asked if she had an opinion as to the window from which Cynthia Barnes had fallen, Dr. Segovia testified that the fracture and dislocation of Barnes's spine could have been caused by her impacting the sign while falling from the middle, open and unbroken, window. She clarified that this injury would not likely have occurred if Barnes had simply fallen and hit the ground. Segovia admitted she did not know from which window Barnes had fallen and could not determine whether she had fallen, jumped, or was pushed out the window.

¶ 23    After the State rested, the trial court denied defendant's motion for a directed finding. Defendant then proceeded by way of stipulation. First, the parties stipulated that, if called to testify, Dr. Ellen Omi would testify that defendant had three stab wounds on his right thigh when he was admitted to the hospital on July 23, 2011. Second, the parties stipulated that the handle of the knife found in the apartment contained a female DNA profile that matched Barnes's DNA profile. A sample taken from the blade of the knife contained two DNA profiles, one of which matched defendant. Barnes could not be excluded from the other profile. Finally, the parties stipulated that a toxicological analysis of a blood sample from Barnes tested positive for cocaine.

¶ 24    During closing argument, defense counsel mentioned that defendant had been stabbed three times in the leg and that Barnes's blood was found on the handle of the knife. She referred to Barnes as "the attacker." The trial court then interrupted counsel, and the following exchange took place:

> "THE COURT: I want to make sure I understand what you're arguing. Are you saying that something happened in self-defense?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Are you asking this court to consider lesser included offenses?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Okay."

¶ 25    Defendant's counsel continued, arguing that Barnes climbed out the window to get away after she stabbed defendant. The court again interrupted:

> "THE COURT: Again, I want to ask you. I want to make sure I understand you exactly. You're saying she stabbed him before she went out the window. Are you asking for consideration of lesser included offenses, are you saying there is some sort of self-defense element going on here?
>
> [DEFENSE COUNSEL]: No, Judge.
>
> THE COURT: You are sure. All right."

¶ 26    Defense counsel's theory of the case was that Barnes either accidently fell out, or was trying to climb out, of the window. Counsel argued that both Barnes and defendant were high on drugs at the time and that "there is no accounting for what that can cause someone to do." She ultimately argued that there was no evidence that defendant pushed Barnes out the window.

¶ 27    Near the end of the State's argument in rebuttal, the court interrupted, saying:

"THE COURT: [Defense Counsel] was not arguing that [defendant's stab wounds were] self-inflicted. Her argument is that they were caused by Ms. Barnes prior to her falling out the window. And she is also telling me emphatically that she does not want me to consider any kind of self-defense theory or lesser included offense."

¶ 28 After passing the case so that defense counsel could speak to defendant regarding the theory of the case, the court continued the case to another date so that defense counsel could confer with defendant and possibly reargue the case.

¶ 29 On September 5, 2014, the trial court allowed defense counsel to reopen her closing argument to clarify her strategy and address the court's questions and concerns. Counsel argued that there was circumstantial evidence that Cynthia Barnes stabbed defendant, but that the evidence was "very, very scarce" and that if the case were being tried by a jury, she "would not even get the [second degree murder] instruction. There is just not the evidence there." Counsel noted that in cases where a second degree murder instruction based on provocation was given to a jury, there was some testimony about a fight, struggle, or mutual combat. Stating that there was no such testimony, counsel declared that "[a]s an officer of the Court, I can't in good faith stand before your honor and argue for second degree, because to do so, I would have to create a story that included self-defense and included provocation and I can't do that because the evidence doesn't support it." Noting that the State had to prove first degree murder before second degree murder could be considered, counsel argued that the State had failed to prove defendant guilty of first degree murder beyond a reasonable doubt.

¶ 30 In rebuttal, the State argued that the only explanation consistent with the evidence was that defendant pushed Barnes out of the broken window and held her out the window for a period of 10 seconds. The trial court found defendant guilty of both counts of first degree murder. It reviewed the evidence and determined that, after some sort of quarrel, Cynthia Barnes came out of a window head first and:

"was held for about 10 seconds, and there's no way this woman is going to maneuver herself like some kind of circus performer for that period of time hanging by her toes of her own volition, or even recklessly. The only way she could have got there is that somebody pushed her out through the window. The only person up there was [defendant]."

The court concluded "[t]here was some kind quarrel that happened, but whatever happened in this case, since I'm being told not to consider any provocation or self-defense, the only way that this woman got out the window is because [defendant] pushed her out the window."

¶ 31 Defense counsel filed motions to reconsider and for a new trial, arguing that, even in the face of her argument against consideration of second degree murder, the trial court could have exercised its discretion to, *sua sponte*, find defendant guilty of a lesser mitigated offense. Counsel requested that the court reconsider the facts that supported the finding of second degree murder. The trial court declined to reconsider its finding of first degree murder. It made this decision "in light of the fact that I was told that I couldn't even instruct the jury on second degree murder, and that if this were a jury trial, that she wouldn't want that, and she would have the absolute right *** to proceed in that fashion." It concluded by stating "I have a woman coming out of a window under circumstances that could only be explained by the finding of first degree murder based on the evidence heard."

¶ 32    At the sentencing hearing, the State presented live testimony regarding two separate occasions in which defendant had engaged in violence against women. Regarding the first instance, Officer Collado testified that, on August 23, 2010, officers observed defendant repeatedly punch and hit a victim as she was lying on the ground, going in and out of consciousness. Regarding the second instance, Officer Rosalyn Sutton testified that, on June 19, 2009, she responded to a call regarding "a naked woman hanging out of a car window." When she arrived at the scene, she found a naked woman lying on the ground, covered in blood "from head to toe." The woman, Ericka Jackson, was rushed to a hospital. Ericka Jackson testified at the sentencing hearing that defendant had driven her to a store to buy liquor. After drinking some of the liquor and falling sleep, Jackson awoke to defendant beating her and threatening to kill her. Defendant forced Jackson to engage in oral sex, and she attempted to escape the car.[1] Jackson testified that she jumped out the window of the car and stated that defendant kicked or pushed her as she fell out of the car. Ericka's sister Monica Jackson testified at the hearing that Ericka was unrecognizable at the hospital, as she was covered in blood and her face was swollen and covered with stab wounds. After Ericka left the hospital, Monica and her family had to care for her for a week or two, including feeding her in bed and helping her to the bathroom.

¶ 33    The State introduced victim impact statements from Cynthia Barnes's mother, daughter, son, and brother. Arguing in aggravation, the State noted that defendant's criminal history showed that defendant could not conform his conduct to the law and that the live testimony regarding the assault of Ericka Jackson demonstrated that he was a clear and present danger to the public. Focusing on defendant's violent past and lack of remorse, the State requested that the court sentence defendant to a "significant time period."

¶ 34    Defense counsel introduced "a stack" of approximately 15 letters written by members of the community in support of defendant. Counsel argued that, though defendant had a criminal background, none of his convictions were for felonies and most of his convictions were related to drugs or alcohol. At the time of his incarceration, he was suffering from alcohol and crack cocaine addiction.

¶ 35    Counsel noted that defendant had "a very extensive" family support system, which consisted of his mother, father, sister, and aunts, all of whom had been in court for a portion of the proceedings. He was pursuing his GED while being held in this case and maintained employment as a factory worker and painter before he was incarcerated.

¶ 36    Defendant expressed his remorse in an allocution. He also mentioned that he was now being treated for clinical depression and that the medication was working.

¶ 37    Noting that the sentencing range for first degree murder was 20 to 60 years' imprisonment, and considering defendant's age, lack of felony criminal history, factors in aggravation, and factors in mitigation, the trial court sentenced defendant to 27 years' imprisonment. On November 20, 2014, the court denied defendant's motion to reconsider his sentence.

¶ 38    Defendant appeals, arguing that his counsel was ineffective for failing to advance a theory of second degree murder. Alternatively, defendant contends that his 27-year sentence for first degree murder was excessive.

_____

[1]The parties later stipulated that Ericka Jackson never told detectives that defendant forced her to perform oral sex.

¶ 39    Second degree murder is not a lesser-included offense of first degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. Rather, it is more accurately described as a lesser-mitigated offense of first degree murder. *Id.* A defendant can only be found guilty of second degree murder if the State has first proven all the elements of first degree murder. 720 ILCS 5/9-2(a), (c) (West 2010); *Wilmington*, 2013 IL 112938, ¶ 48. Then the defendant has the burden of proving a mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2010); *People v. Fort*, 2017 IL 118966, ¶ 33. However, the burden remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, where relevant, the absence of circumstances justifying or exonerating the killing. 720 ILCS 5/9-2(c) (West 2010).

¶ 40    There are two possible mitigating factors: an unreasonable belief that self-defense is justified or the presence of an intense passion resulting from serious provocation by the victim. 720 ILCS 5/9-2(a)(1), (a)(2) (West 2010). Illinois courts have held that serious provocation may arise from substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Tijerina*, 381 Ill. App. 3d 1024, 1031 (2008).

¶ 41    Defendant contends counsel was ineffective in failing to advance a second degree murder theory, as her chosen strategy was based on a misapprehension of the law, specifically that only direct evidence of mitigating factors would support a second degree murder finding.

¶ 42    "To show ineffective assistance of counsel, a defendant must demonstrate that 'his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *People v. Patterson*, 192 Ill. 2d 93, 107 (2000)). A defendant must satisfy both prongs of this test, and a failure to satisfy either prong precludes a finding of ineffectiveness. *Id.* Reviewing courts measure counsel's performance by an objective standard of competence under prevailing professional norms. *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 36. To establish deficient performance, defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Id.*

¶ 43    Defendant's ineffective assistance claim fails, as he is unable to show that his counsel's performance was deficient. It is nearly axiomatic that counsel's choice of trial strategy is " 'virtually unchallengeable' and will generally not support an ineffective assistance of counsel claim." *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) (quoting *People v. Palmer*, 162 Ill. 2d 465, 476 (1994)). Furthermore, counsel's decision to advance an all-or-nothing defense has been recognized as a valid trial strategy " 'and is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law.' " *Spiller*, 2016 IL App (1st) 133389, ¶ 39 (quoting *Walton*, 378 Ill. App. 3d at 589). This court has held that "counsel cannot be found ineffective for failing to request that the trial court consider second degree murder, as the trial court was empowered to consider this lesser offense regardless of counsel's arguments." *Id.* ¶ 40.

¶ 44    Here, the trial court gave counsel multiple opportunities to clarify her theory of the case and reevaluate her strategy of not asking the court to consider second degree murder. It even continued the case so that counsel could confer with defendant about trial strategy. After examining the case law and speaking with defendant, counsel decided that holding the State to its burden of proof and arguing for a finding of not guilty was a valid trial strategy. She set

out her reasons for pursuing this trial strategy in great detail, maintaining that there was no direct evidence that defendant laid his hands on Barnes, let alone pushed her out of a window. Counsel argued that any scenario regarding what happened in the apartment was pure speculation and thus insufficient to support a guilty finding.

¶ 45 Counsel correctly told the court that "you don't even get to a second degree analysis until and unless" the State proved first degree murder. Counsel argued the court, therefore, could not find defendant guilty of first or second degree murder based on provocation, as there was no evidence that defendant caused Barnes's death. On this record before us, we find that counsel's strategy was not based on a misapprehension of the law. See *id.* (holding that counsel's statement that " 'there is no compromise. There is no second degree in this case.' " was not a misapprehension of the law, but an indication that he considered and rejected a dual strategy). We find counsel's defense was a valid trial strategy and her performance was not deficient. As defendant fails to meet the deficient performance prong of the *Strickland* test, his claim of ineffective assistance fails.

¶ 46 Defendant also contends that his 27-year sentence for first degree murder was excessive in light of his struggle with drug addiction, lack of felony convictions, and rehabilitative potential. He also contends that the trial court erred by failing to consider evidence of Barnes's provocation and the financial impact on the state.

¶ 47 A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because a trial court has a superior opportunity "to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). As such, reviewing courts will not alter a defendant's sentence absent an abuse of discretion. *Alexander*, 239 Ill. 2d at 212. Our supreme court has noted that a " 'reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Id.* at 213 (quoting *Stacey*, 193 Ill. 2d at 209).

¶ 48 A sentence should reflect both the seriousness of the offense and the objective of restoring the defendant to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. The trial court is presumed to have considered all relevant factors and any mitigation evidence (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48) but has no obligation to recite each factor and the weight it is given at a sentencing hearing. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. " 'A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 49 Here, defendant was convicted of first degree murder, an offense with a sentencing range of 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2010). The trial court sentenced defendant to 27 years' imprisonment. As the sentence is within the prescribed sentencing range, it is therefore presumed to be proper. *Brown*, 2015 IL App (1st) 130048, ¶ 43.

¶ 50 In sentencing, contrary to defendant's argument, the trial court expressly considered defendant's struggles with drug addiction, his lack of felony background, and his family and community support system. The court then properly weighed these factors against the severity of his crime and the "most violent death" of Cynthia Barnes.

¶ 51    Further, the court was presented with evidence of other criminal activity demonstrating defendant's history of violence against women, hearing from numerous witnesses the details of his assaults on Ericka Jackson and a second, unnamed, female victim. See *People v. Raney*, 2014 IL App (4th) 130551, ¶ 43 (" '[C]riminal conduct for which there has been no prosecution or conviction may be considered in sentencing. Such evidence, however, should be presented by witnesses who can be confronted and cross-examined, rather than by hearsay allegations in the presentence report, and the defendant should have an opportunity to rebut the testimony.' " (quoting *People v. Jackson*, 149 Ill. 2d 540, 548 (1992)). Although defendant had no prior felony convictions, the extensive witness testimony at the sentencing hearing demonstrated that defendant had previously displayed extremely violent behavior. As such, given defendant's background, we believe that the trial court's imposition of a 27-year sentence for first degree murder was not an abuse of discretion.

¶ 52    Finally, defendant asserts that the trial court failed to consider evidence of provocation and the financial impact of defendant's incarceration on the state. As noted above, a trial court is presumed to have considered all relevant factors in mitigation unless there is some indication to the contrary. This presumption also applies to a court's consideration of financial impact statements. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 22. Further, the court was aware of the evidence of provocation, as demonstrated by its findings at trial that there had been "some kind of quarrel" in the apartment. As defendant points to nothing in the trial record that indicates the trial court did not consider evidence of provocation or the financial impact statement at sentencing, we operate under the presumption that it did. *Id.*

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.