2026 IL App (1st) 232298-U

No. 1-23-2298

Filed January 14, 2026

Third Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 16915 |
| | ) | |
| TONY HEAD, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Postconviction petition failed to make a substantial showing that the defendant was deprived of the effective assistance of counsel.

¶ 2     Tony Head appeals the circuit court's partial dismissal of his postconviction petition without an evidentiary hearing. For the following reasons, we affirm.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4        Head was convicted of the first degree murder of Earl Warner, Jr. and the attempted murders of Emmanuel Warner and Kevin Winford.[2] The convictions stem from a shooting incident on December 31, 2011. Emmanuel and Winford testified at Head's trial.

¶ 5        Before trial, both the State and defense filed motions *in limine* to preclude evidence regarding a prior dispute involving Head, Earl, and Emmanuel. Both motions indicated that witness statements and grand jury testimony referred to Head stealing illegal firearms from Earl, which initiated a feud among them. The State wished to exclude such evidence, since it disclosed Earl and Emmanuel were involved in illegal firearm sales. The defense wished to exclude the evidence since it revealed Head's involvement in other crimes and was prejudicial. The trial court ruled that the parties could not elicit any details beyond the fact that a dispute existed.

¶ 6        Emmanuel is Earl's brother and Head's cousin. At the time of trial in 2013, Emmanuel was serving prison sentences for burglary and possession of a stolen firearm. When initially asked about the shooting, Emmanuel stated he was "pleading the fifth." In response to the court's inquiry, he stated that he did not know what happened and believed he did not have to testify. The court found Emmanuel was not at risk of self-incrimination and directed him to testify.

¶ 7        Emmanuel testified that he and Winford rode with Darrell Holmes on the afternoon of December 31, 2011, to purchase marijuana. Upon reaching the intersection of West 60th Street and South Green Street (60th and Green), Emmanuel exited the vehicle to meet the seller. Someone from a passing vehicle fired a gunshot in Emmanuel's direction. Emmanuel ran from the scene. He did not see the shooter. Nor did he see Head in the vicinity.

---

[2]Earl and Emmanuel share the same last name. We use their first names for clarity.

¶ 8        Emmanuel was impeached with an eight-page written statement he gave to an assistant state's attorney (ASA) on April 25, 2012, when he was in custody in the Cook County Jail on pending charges. In the statement, Emmanuel explained that Head and Earl were involved in a dispute. Earl had asked Emmanuel not to get involved and Emmanuel stopped associating with Head. When Emmanuel was at 60th and Green, he observed Head approaching on foot, holding a silver and black handgun. Head raised the handgun, pointing it at Emmanuel. Emmanuel ran. Moments later, he heard three shots. Holmes and Winford drove away. Earl, driving his own vehicle, arrived. Emmanuel ran toward Earl. Head emerged from a crouched position and fired two shots at Earl. Emmanuel fled to his cousin's house. While there, he learned Earl had been shot. He returned to 60th and Green, where Earl was being placed in an ambulance and police officers were on the scene. Later, Emmanuel went to the hospital with his grandmother.

¶ 9        Emmanuel admitted he gave the statement, read it, and signed it. He asserted, however, "Everything in that statement was a lie." When asked whether he testified before a grand jury, Emmanuel repeatedly stated that he did not recall. He was impeached with his grand jury testimony, which was consistent with his written statement. Emmanuel's grand jury testimony added that he spoke with police officers at the hospital, but he did not tell them what happened at that time because he was mad and planned to retaliate. In March 2012, at his grandmother's urging, Emmanuel informed officers that he had witnessed Head shoot Earl.

¶ 10        On cross-examination, defense counsel, Robert Willis, elicited that Emmanuel: did not see Head when he was at 60th and Green on December 31, 2011, did not see Head shoot Earl, and did not see who shot Earl. Willis also elicited that Emmanuel had several opportunities to speak with police officers, both on the scene and at the hospital, and never told a police officer he had observed Head shoot Earl. Willis then asked about the April 25, 2012, written statement. He elicited that

Emmanuel was in jail at the time, did not have a lawyer present, and never told a police officer he had witnessed Head shoot Earl until that date. One by one, Willis asked Emmanuel whether each assertion in the statement was true. Emmanuel responded that they were untrue. Finally, Willis asked Emmanuel whether his grand jury testimony was true, and Emmanuel stated it was not.

¶ 11      On redirect, the State asked Emmanuel if, on April 13, 2012, he told an ASA and a detective that he observed Head shoot Earl. Emmanuel stated that he did not recall. On recross, Emmanuel testified that if he made any such statement on April 13, it was not true.

¶ 12      Winford was called to testify next. At the time of trial, he was incarcerated in a federal penitentiary on a weapons conviction. Winford testified that he went with Holmes and Emmanuel to buy marijuana on Green Street on December 31, 2011. After Emmanuel exited their vehicle, a person wearing a black sweater emerged from a gangway and began shooting at their vehicle. Winford did not see the shooter's face and denied that he saw Head. Holmes and Winford sped away. A few blocks away, they encountered Earl, driving his vehicle. Winford entered Earl's vehicle and told him about the shooting. Earl handed Winford a handgun and they drove toward Green Street in search of Emmanuel. Upon reaching Green Street, a light-skinned person wearing all black—the same person who fired shots earlier—approached and fired shots at Earl's vehicle. Earl was struck in the neck. Winford exited the vehicle and exchanged gunfire with the shooter. Both ran away upon the sound of approaching sirens. Winford was arrested at his residence at 3 a.m. the next morning and charged with reckless discharge of a firearm. Police found several firearms on the premises.

¶ 13      Winford was impeached with two prior statements. The first occurred following his arrest on January 1, 2012, when Winford told a detective that Head shot Earl and identified Head in a

photo array. In April 2012, Winford gave a video recorded statement, again identifying Head as the shooter.

¶ 14      On cross-examination, Winford testified he did not know who the shooter was, as a hood concealed their face. Winford admitted he had previously stated that Head shot Earl but disavowed the statement as untrue.

¶ 15      After the State rested, Willis recalled Winford, who then testified that he had never spoken with Willis before the trial began. At the time Winford gave his videotaped statement, he was being held in jail on pending charges. Portions of the video were replayed. Winford repeated that the statement was false, and he did not observe Head shoot at anyone. On cross-examination, Winford acknowledged making the statements in the video recording and conceded that he stated it was true at that time. In the recording, the ASA asked Winford why he had not come forward right away. Winford explained that he decided to tell authorities Head was the shooter just before his arrest because he felt it was the right thing to do and "stuff was getting out of hand." Winford denied remembering this conversation.

¶ 16      In closing argument, Willis noted that Emmanuel and Winford testified "from the stand" that Head was not the shooter. He also noted that Emmanuel did not tell police Head shot Earl the day or night of the shooting, despite having opportunities to do so. This was significant, Willis argued, because "human reality" is that a person who saw their brother shot and killed, and knew who the shooter was, would have immediately told the police. Yet, Emmanuel did not approach the police officers who responded to the scene, did not call to make a report, and did not name Head when he spoke with officers at the hospital later that evening. Emmanuel only named Head as the shooter months later, when he was in jail facing charges and "under the pressure of the law." Willis emphasized that Emmanuel testified his grand jury and written statements were not true.

¶ 17    As to Winford, Willis argued that the oral statement he allegedly gave on January 1, 2012, did not happen, as no witness testified to being present for it. Rather, the first time Winford implicated Head was in the videotaped statement made months later when Winford was in custody, which he disavowed at trial.

¶ 18    Willis asserted that the jury would have to judge Emmanuel's and Winford's credibility "within the context of all that you heard." He then pointed to the lack of corroborating physical evidence and contended the State had not proven Head guilty beyond a reasonable doubt.

¶ 19    The jury found Head guilty of first degree murder and two counts of attempted first degree murder. He received an aggregate sentence of 76 years' imprisonment. This court affirmed his conviction on direct appeal. *People v. Head*, 2016 IL App (1st) 141789-U (unpublished order under Supreme Court Rule 23).

¶ 20    In 2018, Head filed a postconviction petition asserting several claims of ineffective assistance. Among them, Head alleged his trial counsel failed to elicit testimony from Emmanuel and Winford as to why they gave prior inconsistent statements. He also alleged that trial counsel failed to call Steve Nichols, a purported eyewitness, who would have testified that Head was not the shooter. Affidavits from Emmanuel, Winford, and Nichols were attached to the petition.

¶ 21    In his affidavit, Emmanuel stated that he gave false statements naming Head as the shooter. Other people told Emmanuel that Head was the shooter, and he told this to police because he was "mad at Tony Head and suspected him of being the shooter because he had had a prior argument with [Earl]." After his initial statement, police pressured him to maintain the accusation. He repeated it before the grand jury out of fear of the police and prosecutors. Before Head's trial, Emmanuel visited Willis's office and informed him he had lied to police and did not actually view

the shooter. Emmanuel was willing to testify regarding why he had falsely identified Head, but Willis did not ask him about it during his testimony.

¶ 22    Winford attested that he was forced to implicate Head in the shootings out of fear that the police or ASAs would "get [him] into more trouble with federal authorities." After informing prosecutors that his earlier statements were false, the ASAs called him to testify. Head's trial counsel did not interview Winford before he took the stand. Counsel never asked Winford to explain why he had given prior inconsistent statements naming Head as the shooter. Winford would have testified that "other people" had told him Head was the shooter, he assumed it was Head due to the dispute with Earl, and police and ASAs forced him to make his prior statements.

¶ 23    In Nichols's affidavit, he attested to observing the shooting and viewing the shooter's face. The shooter was not Head, he claimed, as Nichols had known Head for years and would have recognized him. Willis interviewed Nichols and asked him to attend the trial. Nichols was present and willing to testify but was not called.

¶ 24    The court advanced the petition to the second stage. Upon the State's motion, the court dismissed the claims related to Emmanuel and Winford, reasoning that Willis's decisions as to which questions to ask of witnesses were trial strategy. The court advanced the claim regarding Nichols to a third-stage evidentiary hearing.

¶ 25    Nichols and Willis testified at the hearing. Nichols's testimony was impeached by evidence he told an investigator the claims in his affidavit were untrue. Willis did not recall why he did not call Nichols to testify at the trial. The trial court denied Head's claim, finding the decision not to call Nichols was strategic and his credibility could have been impeached.

¶ 26    On appeal, Head does not challenge the trial court's denial of his claim related to Nichols, but argues the court erred in dismissing his claims related to Emmanuel and Winford at the second stage without an evidentiary hearing.

¶ 27                                II. ANALYSIS

¶ 28    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)) provides a three-stage process to review a criminal defendant's claims that a deprivation of constitutional rights occurred in the proceedings that resulted in their conviction. *People v. Hatter*, 2021 IL 125981, ¶ 22. At the second stage, the State may either answer the defendant's petition or file a motion to dismiss it as legally deficient. *People v. Pingelton*, 2022 IL 127680, ¶ 34. To avoid dismissal and proceed to a third-stage evidentiary hearing, the petition and its accompanying documentation must make a substantial showing of a constitutional violation. *People v. Thames*, 2021 IL App (1st) 180071, ¶ 76. We review a trial court's second-stage dismissal of postconviction claims *de novo*. *People v. Urzua*, 2023 IL 127789, ¶ 28.

¶ 29    Head claims he was deprived of his right to the effective assistance of counsel in his trial. We evaluate a claim of ineffective assistance of counsel under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a defendant must demonstrate counsel's performance fell below an objective standard of reasonableness. *People v. James*, 2023 IL App (1st) 192232, ¶ 46. Second, the defendant must show he suffered prejudice due to counsel's deficient performance. *Id*. However, a defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *People v. Davis*, 2023 IL App (1st) 220231, ¶ 29. "[C]ounsel's choice of trial strategy is virtually unchallengeable and will generally not support an ineffective assistance of counsel claim." (Internal quotation marks omitted.) *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 43. "[T]he manner in which

counsel elects to examine witnesses is regarded as a matter of trial strategy and will not support an ineffective assistance of counsel claim unless the chosen tactic is objectively unreasonable." *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 84.

¶ 30    Here, the trial record establishes that the questions Willis asked of Emmanuel and Winford were part of his trial strategy. Willis's closing argument gave cogent reasoning as to why the jury should believe the two witnesses' trial testimony and disregard their prior statements naming Head as the shooter. As to Emmanuel, counsel submitted that he would have told authorities the night of the shooting if he knew Head had shot his brother. But Emmanuel did not, despite having opportunities to do so, both at the scene and later at the hospital. Emmanuel only made statements implicating Head months later when he was in jail facing charges of his own and "under pressure from the law." As to Winford, Willis also emphasized his recorded statement implicating Head did not occur until months afterward. The questions Willis asked Emmanuel and Winford elicited testimony consistent with Willis's closing argument. Although Willis's strategy was unsuccessful, we cannot find that it was objectively unreasonable. See *People v. Peterson*, 2017 IL 120331, ¶ 88 ("We may not conclude that a particular strategy or tactic was unreasonable simply because it has proved unsuccessful."). Accordingly, Head's petition and supporting affidavits fail to rebut the presumption of trial strategy for an ineffectiveness claim.

¶ 31    In addition, Emmanuel and Winford's statements that they assumed the shooter was Head because of his dispute with Earl would have likely prompted additional inquiry into the dispute. The trial court's ruling on the parties' motions *in limine* barred such inquiry. But if Willis had elicited this testimony, it could have opened the door to allow the State to elicit evidence that Head had stolen firearms from Earl. That would have been highly prejudicial. Evidence of Head's involvement in stolen firearms both shows other criminal acts and supplies a motive, making it

more probable that he was the shooter. Thus, Willis had a compelling strategic reason to not elicit the dispute testimony from Emmanuel and Winford.

¶ 32       Apart from trial strategy, Head cannot establish prejudice resulting from Willis's failure to ask Emmanuel and Winford why they made prior statements naming Head as the shooter. To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Johnson*, 2021 IL 126291, ¶ 52. Even if Willis had asked such questions and Emmanuel and Winford would have testified as they state in their affidavits, a different result is not reasonably probable. As noted, evidence about the dispute between Earl and Head would have likely introduced prejudicial evidence against Head. Also, Emmanuel and Winford would have still been impeached by their prior inconsistent statements, and the jury would have still had to determine their credibility. Further, neither Emmanuel nor Winford would have excluded Head as the shooter, as both would have testified that they did not see the shooter but assumed it was Head because of the dispute and because "other people" said it was Head. Evidence that other people said the shooter was Head would have been prejudicial, effectively hearsay statements from non-testifying witnesses accusing Head of the crime. In sum, we do not find this testimony from Emmanuel and Winford raises a reasonable probability of a different outcome.

¶ 33       Lastly, we note that Head argues Willis was ineffective for failing to interview Winford before trial. This argument is forfeited since it was not included in the postconviction petition. See *People v. Reed*, 2014 IL App (1st) 122610, ¶ 55 (arguments raised for the first time on appeal from dismissal of a postconviction petition are forfeited). Nevertheless, the argument is without merit as such an interview would have only apprised Willis of the potential testimony which we have found Willis had strategic reasons to not elicit and would not have made a difference.

¶ 34                                  III. CONCLUSION

¶ 35        Based on the foregoing, we affirm the judgment of the circuit court.

¶ 36        Affirmed.