THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON DOMINGUEZ, Defendant-Appellant.

Second District    No. 2—01—0366

Opinion filed June 28, 2002.—Rehearing denied July 30, 2002.

Jed H. Stone and John Curnyn, both of Stone & Associates, of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE CALLUM delivered the opinion of the court:

Following a jury trial, defendant, Ramon Dominguez, was convicted of first-degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1998)). He was sentenced to 28 years' imprisonment. He appeals, arguing that (1) his counsel and the trial court erred in failing to instruct the jury on the lesser-included offense of involuntary manslaughter (720 ILCS 5/9—3(a) (West 1998)); and (2) he was entitled to a hearing on his fitness to be tried and sentenced. We affirm.

## I. FACTS

At trial, the State produced the following evidence. Dawn Ramirez testified that she was a 911 operator for the North Chicago police department. On May 28, 1999, about 10:30 p.m., a male called 911 and reported that his wife had been shot at his house. He stated that the shooter had run away. The caller lived at 1224 Park. According to Ramirez, the caller was "hysterical."

Gerardo Reyes testified that defendant lived at 1224 Park with defendant's wife Martha Reyes and their children, G.D. and S.D.

S.D., defendant's six-year-old daughter, testified that she and her mother were in a bedroom when defendant walked in. S.D. saw defendant talk loudly to her mother, retrieve a gun from a closet, put it back, retrieve it again, and use it to kill her mother. Defendant then called the police.

Richard Wilson, a North Chicago police officer, testified that he was dispatched to 1224 Park. Defendant was standing on the porch. He was hysterical, and he said that his wife had been shot. He spoke English but with a Spanish accent. He led Wilson into the house, and Wilson saw a woman lying on the floor in a bedroom. In the same room, Wilson found a semiautomatic handgun under a bed.

Christopher Berg, another North Chicago police officer, was at the scene with Wilson. Berg testified that he and defendant spoke to each other in English and had no difficulty understanding each other. Defendant said that he and his children had been in the house and that his wife had been on the porch. Defendant stated that he heard a gunshot, ran outside, and saw someone running away. Defendant said that he dragged his wife into the house and went to retrieve his gun.

Outside the house, Berg found no evidence of any kind. Inside the house, Berg saw no indication that anyone or anything had been dragged.

Robert D. Peters, a North Chicago firefighter/paramedic, was also dispatched to 1224 Park. He testified that he had smelled gunpowder in the bedroom.

William Jones, another North Chicago police officer at the scene, testified that the gun under the bed was lacking a magazine and thus appeared to be empty. There were no signs of a struggle inside the house.

Dean Kharasch, a North Chicago police officer, was at the scene as well. He testified that he asked defendant about the gun. Defendant said that the shooter had used the gun to shoot his wife in the living room. Defendant added that he fought with the shooter, who then threw the gun under the bed. Kharasch had no trouble understanding defendant's English. Kharasch's investigation confirmed that the shooting had occurred inside the house. In the bedroom closet, Kharasch found the magazine to the gun and a box of ammunition.

Brian Carder, a North Chicago police detective, testified that he found a shell casing on a dresser in the bedroom. No other casings were found in the house. No fingerprints were found on the gun. The gun could have been fired without a magazine if a bullet had been in the chamber.

The parties stipulated that Elizabeth Horvath, a physician, would testify that Martha Reyes died from a gunshot wound to the chest. Nancy Jones, a forensic pathologist, testified that Reyes was shot from no more than 18 inches away.

Robert Wilson, a firearms examiner for the Northern Illinois Police Crime Laboratory, testified that the shell casing on the dresser had been ejected from the gun found under the bed. He further stated that the same gun had fired the bullet recovered from Martha Reyes's body. That bullet matched the bullets found in the closet.

The State rested, and defendant presented no evidence. In response to the court's inquiry, defendant stated that he did not wish to testify. During the conference on jury instructions, neither the parties nor the court addressed the propriety of an instruction on involuntary manslaughter. No such instruction was tendered to the court or given to the jury.

In his closing argument, defense attorney Michael Melius acknowledged that defendant had shot his wife. Melius stated, however, that defendant's act did not evince an intent to kill or do great bodily harm. Melius argued:

"We read about it all the time. It happens in accidents. It hap-

pens when people are negligent. It happens when people are reckless. It happens when people are stupid. It happens when people pick up weapons without determining whether or not the gun is loaded.

Is that intent to kill somebody then if you pick up that gun, and *** you believe that it's not loaded and then you pull the trigger and the gun goes off? ***

*** That could very well be an accident, recklessness, negligence, stupidity, any number of different things[.] *** But it doesn't make it murder."

The jury found defendant guilty of first-degree murder.

Represented by new counsel, defendant filed a posttrial motion, arguing that his trial counsel did not allow him to decide whether to submit an instruction on involuntary manslaughter. Defendant further argued that counsel was ineffective for failing to submit the instruction.

In support, defendant filed various affidavits. In his own affidavit, defendant averred that he was not fluent in English and did not understand his option to instruct the jury on involuntary manslaughter. His trial counsel presented the issue in a "really fast" discussion in the courtroom and did not use an interpreter. In a separate affidavit, Melius confirmed that he and his trial partner, Martin Shaffer, explained the issue to defendant in the courtroom and did not use an interpreter.

In a third affidavit, Michael J. Boehm, a priest, averred that he was fluent in Spanish and met weekly with defendant. Defendant's English skills were "extremely limited to the point of being nonexistent," and he did not understand what his lawyers told him. Melius did not respond to Boehm's repeated attempts to contact him.

At a hearing on the motion, Shaffer testified that he and defendant spoke to each other in English. Defendant did not speak English as well as a native speaker and usually spoke in single syllables. Nevertheless, Shaffer always believed that defendant could understand him. Shaffer never asked defendant to explain a legal concept in his own words.

Melius testified that he brought an interpreter to his initial meetings with defendant but not to later meetings. At the later meetings, Melius and defendant spoke English and "had no problem" communicating. Defendant occasionally "threw in some Spanish," but Melius then asked him to speak English, and defendant complied. They discussed all legal concepts in English and without an interpreter. Defendant was not fluent in English and spoke mostly in "yeses and nos."

Melius further testified that he and defendant had three brief discussions about a lesser-included-offense instruction. Each discussion was in English and without an interpreter. Melius explained how the instruction could affect the case, how it could present a "compromise." Melius used plain English, and defendant understood his words, though not necessarily the legal technicalities. Melius made no recommendation, and defendant did not request an instruction. There was "kind of a consensus *** to go for all or nothing." The decision was made "with the defendant." Melius believed that the strategy was sound, but he would not have pursued it had defendant objected. Melius concluded:

> "There was a discussion between myself, Mr. Shaffer and Mr. Dominguez about a lesser included offense. In our discussions, it was determined that we would not submit a lesser included offense [instruction]. Ultimately, if Mr. Dominguez would have said I want [an instruction], I would have submitted it. He did not say that. *** Thus it would have been my ultimate decision, I guess, not to do that because I didn't recommend it and he didn't say that he wanted it."

Boehm testified that defendant once asked him what manslaughter was. Defendant was very confused, and he frequently reiterated that he did not understand the proceedings. Boehm never spoke to defendant in English, as defendant did not speak English fluently. Defendant could speak sufficient English to participate in a "normal" conversation, but not in one "that involved any type of detail." Defendant said that he was frustrated because his lawyers "didn't give him enough time," but he did not say that he could not understand them. Nevertheless, Boehm believed that defendant could not understand.

Joanne Arreguin, defendant's ex-wife, testified that by 1994 defendant could speak English sentences and string them together. He occasionally inserted some Spanish. He spoke English with his children but had more difficulty reading English. By May 1999, he mixed Spanish and English more frequently.

Before the court ruled on the posttrial motion, defendant moved for a fitness hearing. He argued that he was taking psychotropic medication before, during, and after his trial. The court proceeded to take evidence on that issue.

Defendant called Michael M. Gelbort, a clinical psychologist, who testified that he had evaluated defendant and had not "reached a clear-cut opinion as to fitness at the time of trial." However, Gelbort had "no doubt" that defendant was not fit to be sentenced. Defendant was suffering from psychotic depression and was taking significant

psychotropic medications. He "was not really in very good contact with what was going on around him." He did not remember much of his trial. He was exhibiting "major depressive symptoms of psychotic proportion," including suicidal ideations, auditory hallucinations, considerable difficulty stringing thoughts together, and an inability to process information. Defendant's language barrier contributed to the problem, though Gelbort and defendant spoke English to each other, and Gelbort was able to evaluate defendant without an interpreter. In English, defendant told Gelbort about his education and his children and further explained that he had shot his wife accidentally. Gelbort was able to understand those statements.

The State called John Dunne, also a clinical psychologist, who testified that he had evaluated defendant with an interpreter. Defendant was suffering from psychotic depression and possibly post-traumatic stress disorder. He stated that his medications affected his concentration and made him dizzy and sleepy. Nevertheless, he was very responsive to Dunne's questions.

Dunne testified that defendant identified two of the four medications he was taking. Defendant explained the charge of which he had been convicted and how his wife had died. He described the gun and stated that he had thought it was empty and had fired it accidentally. He remembered the names of his trial lawyers, his current lawyer, and the trial judge. He recalled the jury, the witnesses, and the evidence. He quoted S.D.'s testimony. He recalled that he did not testify and stated that his medications had prevented him from testifying. He stated that his lawyers had explained involuntary manslaughter. He knew that he was facing at least 20 years' imprisonment and would not be eligible for good-time credit. He was not distracted or hallucinating. His hallucinations occurred at night and would not affect him in court. His ability to understand or cooperate was not impaired. He did not exhibit significant memory loss or significant difficulty thinking. Dunne concluded that defendant was fit to be sentenced. However, Dunne was unable to determine whether he was fit at the time of trial.

The court credited Dunne's testimony. The court further noted its own observations that defendant "function[ed] properly [and] appeared to be oriented." Thus, the court found no *bona fide* doubt of defendant's fitness at trial or for sentencing, and it denied the motion for a fitness hearing.

Returning to defendant's posttrial motion, the court stated that it was "surprising" that the defense offered no instruction on involuntary manslaughter. Nevertheless, the court determined that "the defendant was able to communicate with his attorneys." The court

further found that the option to submit the instruction "was explained to the defendant, and the defendant opted not to exercise that right." The court concluded that defendant made the decision with adequate information and understanding. His posttrial motion was denied, he was sentenced, and he appealed.

## II. INVOLUNTARY MANSLAUGHTER INSTRUCTION

Defendant argues that, for three reasons, he is entitled to a new trial because the jury was not instructed on involuntary manslaughter. He asserts that (1) his trial attorneys denied him his right to decide whether to submit the instruction and that, even if he did decide, he was incapable of making a knowing and intelligent decision; (2) his trial attorneys were ineffective for failing to recommend the instruction; and (3) the trial court should have issued the instruction *sua sponte*.

### A. The Decision

■ defendant, rather than his counsel, has the right to make the ultimate decision whether to tender an instruction on a lesser-included offense. *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994). The defendant must make the decision knowingly and intelligently, though the trial court need not inquire whether the decision is so informed. See *People v. DePaolo*, 317 Ill. App. 3d 301, 310-11 (2000). Here, whether defendant made the ultimate decision and whether he did so knowingly and intelligently were disputed questions of fact. Thus, we may reverse the trial court's determinations only if they are against the manifest weight of the evidence. See *Brocksmith*, 162 Ill. 2d at 229 (decision to tender lesser-included instruction analogous to decision to plead guilty); *People v. Kelley*, 44 Ill. 2d 315, 317 (1970) (determination whether guilty plea was involuntary rested on credibility of witnesses and thus was subject to reversal only if against the manifest weight of the evidence).

■ Defendant relies first on Melius's statement that "it would have been my ultimate decision, I guess, not to" instruct the jury on involuntary manslaughter. However, as is indicated by the phrase "I guess," Melius was not firm in that belief. Indeed, Melius testified that he, Shaffer, and defendant reached "kind of a consensus *** to go for all or nothing." That statement implies that the decision was as much defendant's as it was his attorneys'.

Furthermore, despite any doubt about who ultimately made the decision, there was no doubt that defendant ultimately had *control* over the decision, and that is what he was required to have. See *People v. Segoviano*, 189 Ill. 2d 228, 240 (2000) (under *Brocksmith*, the lesser-included-instruction decision is one "over which a defendant

ultimately must have control"). Melius testified unequivocally that, had defendant requested an instruction, Melius would have complied. Thus, the evidence supported the trial court's finding that defendant was given the authority to make the decision and, with his attorneys, made the decision to forgo the instruction.

Defendant responds that, because his attorneys discussed the issue briefly and in English, he could not have made a knowing and intelligent decision. We first note that it is unclear how much time was spent on the issue. In his affidavit, defendant stated that the issue arose in one "really fast" discussion. At the hearing, however, Melius testified that he and defendant had three discussions, though each was brief. In light of that conflict, the trial court was entitled to credit Melius's testimony and find that the three discussions, though brief, were collectively sufficient to inform defendant's decision.

As for defendant's language ability, the evidence was wildly divergent. Boehm described defendant's English skills as virtually "non-existent." Nevertheless, the bulk of the evidence suggested otherwise. At trial, a 911 operator and several police officers indicated that they were able to communicate substantively with defendant in English. After trial, Shaffer, Melius, and Gelbort testified similarly. Arreguin confirmed that defendant had been able to express complex thoughts in English. The trial court, too, heard defendant speak, as when he told the court that he wished not to testify at trial. Thus, the court was clearly permitted to find that defendant was able to communicate with his attorneys and that his language skills did not prevent him from making a knowing and intelligent decision.

## B. Ineffective Assistance of Counsel

■ Next, defendant contends that his attorneys were ineffective for failing to recommend that he submit an instruction on involuntary manslaughter. To establish that he received the ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness; and (2) it is reasonably probable that, but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068 (1984); *People v. Page*, 193 Ill. 2d 120, 131-32 (2000). The defendant must overcome a strong presumption that counsel's actions were the product of sound trial strategy. *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996). Indeed, strategic decisions are virtually unchallengeable as long as the strategy was not so unsound that it failed to subject the State's case to any meaningful adversarial testing. *People v. West*, 187 Ill. 2d 418, 432-33 (1999).

In *People v. McIntosh*, 305 Ill. App. 3d 462 (1999), the defendant was convicted of criminal sexual assault. The defendant's theory of the case was that his encounter with the victim had been consensual. On appeal, the defendant argued that his trial counsel was ineffective for failing to instruct the jury on the lesser-included offense of criminal sexual abuse. The appellate court disagreed:

> "[T]he decision of whether to submit an instruction on a lesser-included offense is typically considered to be one of trial strategy, which has no bearing on the competency of counsel. *** Defendant's attorney may have strategized that it was better for the jury not to have the choice of the lesser-included offense in the hope that they would be more inclined to acquit ***." *McIntosh*, 305 Ill. App. 3d at 471.

See also *People v. Nunez*, 319 Ill. App. 3d 652, 659 (2001) ("Defense counsel's decision not to pursue a lesser included offense was part of a cohesive trial strategy and did not constitute ineffective assistance").

■ Here, defendant's theory of the case was that he had shot his wife without a mental state required for murder. In support, the defense relied on the evidence that the gun had appeared to be empty. We acknowledge that an instruction on involuntary manslaughter would not have been inconsistent with defendant's theory. Nevertheless, counsel reasonably could have believed that the instruction would have converted a likely acquittal into a likely conviction of the lesser crime. The strategy may have failed, but so must defendant's claim that counsel was ineffective. See *Gapski*, 283 Ill. App. 3d at 942-43.

## C. *Sua Sponte*

■ Defendant's final argument on this issue is that, in failing to instruct the jury *sua sponte* on involuntary manslaughter, the trial court abused its discretion to do so. See *People v. Garcia*, 188 Ill. 2d 265, 282 (1999). However, neither in his posttrial motion nor at the hearing thereon did defendant challenge the court's exercise of its discretion on this point. Thus, this argument is waived. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal"). Furthermore, even if we wanted to evaluate the court's exercise of its discretion, defendant's failure to elicit the court's rationale prohibits us from doing so. *Cf. Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (without transcript of hearing on motion, "there is no basis for holding that the trial court abused discretion in denying the motion"). As a result, we decline to address this issue.

## III. FITNESS

On this point, defendant raises two arguments. He asserts that (1)

the trial court erred in finding no *bona fide* doubt of his fitness; and (2) his trial attorneys were ineffective for failing to move for a fitness hearing before trial.

## A. *Bona Fide* Doubt

■ A defendant is presumed fit, and he will be deemed unfit only if he is unable to understand the nature and purpose of the proceedings or to assist in his defense. He is entitled to a fitness hearing only if there exists a *bona fide* doubt of his fitness. Relevant factors in determining the existence of a *bona fide* doubt include the defendant's irrational behavior, his demeanor at trial, and medical opinions. There are no fixed or immutable signs that invariably indicate a *bona fide* doubt. Indeed, the question is often a difficult one that implicates a wide range of manifestations and subtle nuances. *People v. Easley*, 192 Ill. 2d 307, 318-19 (2000). We may reverse the trial court's resolution of the question only if the court abused its discretion. *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001).

■ As to whether defendant was fit for trial, neither psychologist offered a definitive opinion. As a result, no professional evaluation stood to contradict the court's own assessment of defendant's behavior and demeanor at trial. The court stated that it had seen nothing in defendant's conduct to indicate an inability to understand or participate in the proceedings. The record of the trial supports the court's finding; indeed, when defendant spoke, he spoke rationally, and the court never needed to address any inappropriate behavior. Thus, regardless of the general soundness of defendant's mind, the court did not abuse its discretion in finding that he had been fit for trial. See *Easley*, 192 Ill. 2d at 320 ("Fitness speaks only to a person's ability to function within the context of a trial. *** A defendant can be fit for trial although his or her mind may be otherwise unsound").

■ As to defendant's fitness for sentencing, Gelbort and Dunne offered totally opposite views. Each assessment was thorough and reasoned. However, the trial court chose to credit Dunne, whose assessment squared with its own observations. We have no basis to quarrel with its choice. See *People v. Eddmonds*, 143 Ill. 2d 501, 522-23 (1991) (no *bona fide* doubt despite conflict in medical evidence).

Defendant asserts that "Dunne's data contradict[ed] his conclusions," but we disagree. Though Dunne noted defendant's mental illness, medications, and the side effects that defendant reported, the issue again was not defendant's condition in general but his ability to understand and participate in the proceedings. Dunne's conclusion was based on what he perceived to be defendant's near-mastery of the most intricate details of his trial, and that observation clearly sup-

ported Dunne's finding. See *Eddmonds*, 143 Ill. 2d at 520-21 (despite mental illness, no *bona fide* doubt of fitness where defendant exhibited clear understanding of proceedings).

In sum, Dunne's testimony, along with the court's own observations, sufficed to allow the court to find no *bona fide* doubt of defendant's fitness for sentencing. The court did not abuse its discretion.

## B. Ineffective Assistance of Counsel

■ Finally, defendant asserts that his trial attorneys were ineffective for failing to move for a fitness hearing. That claim may succeed only if there exists a reasonable probability that, had defendant received a fitness hearing, he would have been found unfit to stand trial. *People v. Mitchell*, 189 Ill. 2d 312, 334 (2000). In attempting to show that probability, defendant relies on the same evidence that the trial court rejected as a basis for a *bona fide* doubt. Defendant does not explain how, if that evidence was insufficient to raise a *bona fide* doubt of his fitness, it would have sufficed to prove that defendant was actually unfit. Thus, we conclude that defendant's trial attorneys were not ineffective.

## IV. CONCLUSION

For these reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

O'MALLEY and BYRNE, JJ., concur.