NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230092-U

NO. 4-23-0092

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 8, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Whiteside County |
| NICHOLE R. ELSESSER, | ) | No. 19CF382 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Patricia A. Senneff, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE TURNER delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, finding (1) the State proved defendant guilty of first
degree murder beyond a reasonable doubt, (2) the court would not reduce
defendant's conviction to second degree murder, (3) counsel did not render
ineffective assistance by failing to pursue self-defense and lesser-included
offenses, as those were matters of trial strategy, and (4) defendant's sentence was
not excessive.

¶ 2     In January 2020, the State charged defendant, Nichole R. Elsesser, with first

degree murder (720 ILCS 5/9-1(a)(2) (West 2018)), alleging defendant, without lawful

justification, stabbed Tracy Russell multiple times with a knife, causing his death, while knowing

her acts created a strong probability of death or great bodily harm. The State also charged

defendant with second degree murder (720 ILCS 5/9-2(a)(1) (West 2018)), alleging defendant

committed first degree murder while acting under a sudden and intense passion resulting from

serious provocation by Russell. The State later dismissed that charge.

¶ 3        Before trial, defense counsel told the trial court defendant was not going to pursue self-defense as a theory of the case. Counsel also did not pursue theories based on lesser-included offenses. During trial, counsel focused on evidence defendant believed she merely "jabbed" Russell once with what she thought was a pencil. Counsel argued the State failed to prove beyond a reasonable doubt defendant knew her acts created a strong probability of death or great bodily harm or that she was the person who caused Russell's death.

¶ 4        In August 2022, a jury found defendant guilty of first degree murder. The trial court sentenced defendant to 45 years' imprisonment.

¶ 5        On appeal, defendant contends (1) the State failed to prove her guilty of first degree murder beyond a reasonable doubt because it failed to prove she knew her acts created a strong probability of death or great bodily harm, (2) if the State sufficiently proved first degree murder, this court should reduce her conviction to second degree murder, (3) her counsel rendered ineffective assistance by failing to pursue theories of self-defense and the lesser-included offenses of involuntary manslaughter and second-degree murder, and (4) her sentence was excessive.

¶ 6        We determine the evidence was sufficient to convict defendant beyond a reasonable doubt and counsel did not render ineffective assistance. We decline to reduce defendant's conviction and find her sentence was not excessive. Accordingly, we affirm.

¶ 7                                I. BACKGROUND

¶ 8        The Stated charged defendant in connection with the December 14 or 15, 2019, death of Russell at what witnesses referred to as either a house, trailer, or cabin in Rock Falls, Illinois, co-owned by Catalin Manea and William Bushman. Before trial, the State noted the defense had not asserted any affirmative defenses. Defense counsel told the trial court they had

not disclosed anything because "we have no intentions on filing a defense of self-defense." Counsel stated, "if we would allege self-defense to murder, per the law, she would have to admit that she committed the murder," and counsel further explained, "We are not saying that, we are not arguing self-defense to murder and our position is that she is innocent of first degree murder and second degree murder." Counsel then repeated the defense did not intend to raise self-defense and said "she didn't commit any act that caused a murder, a first degree murder, a second degree murder or any act that substantially caused it." The State subsequently dismissed the second degree murder charge.

¶ 9 Evidence at trial showed Russell was a trained, "golden glove champion" boxer, and his family owned a boxing gym in the area. He was described by defendant and others as defendant's best friend. They never dated. At the time of incident, defendant was 45 years of age. On December 15, 2019, Russell was found deceased on the deck of Bushman's house. The house had at least two doors, one of which exited to the front and the other to the side.

¶ 10 Jeff Thew, a crime scene investigator with the Illinois State Police, identified photos of the crime scene. In the kitchen, a steak knife was found on a peninsula. The blade of the knife was just under five inches in length. There were blood-like stains on the blade and handle. A drawer containing an empty cutlery tray was lying in the middle of the floor. There was an opening in the counter where the drawer should have been. Miscellaneous silverware and cutlery, including knives similar to the one found on the counter, were on the floor. Otherwise, the interior of the residence seemed orderly. No pens or pencils with blood-like stains on them were found, but Thew admitted he did not look for pens or pencils. Thew did not collect fingerprints from the knife or the drawer. DNA was collected from the knife handle.

¶ 11          Outside the house on the deck was a "BBQ style grill" and blood-like stains on the lid of the grill and on the deck. A photo of Russell's body on the deck depicted large blood-like stains, a box, inserts from the grill, ash, and an open bottle of alcohol. There were a couple of footprints around Russell's body. There were also footprints with ash or blood-like stains in the living room of the residence. Footwear impressions were taken, but Thew did not examine defendant's footwear. A small blood-like stain was found near a recliner. Thew admitted it was possible Russell was stabbed with a pen or pencil for it to have left such a small stain. However, he also testified it was possible it came from the end of a knife. There was no indication of smears in the blood-like stains on the deck or evidence of the body being moved through the stains. Thew opined the deck was the primary crime scene and the incident occurred there instead of inside the house.

¶ 12          Thew noted Russell had wounds on the inside of his left leg, on the left side of his abdomen, and on the upper right side of his back or shoulder blade area. All three had a blood-like substance in the area of the wound, with most coming from the leg. Thew did not believe the wounds would have been caused by a pen or pencil. Russell was wearing a coat, and Thew stated it was possible a pen or pencil would not have gone through such a coat.

¶ 13          Mark Peters, a forensic pathologist, performed an autopsy and testified Russell had wounds consistent with being stabbed by a kitchen knife. Peters identified wounds to Russell's left inner thigh, abdomen, and right arm. The wound to the left thigh was three inches deep and severed the femoral artery, which would typically cause a person to bleed to death within 5 to 10 minutes. In Peter's opinion, that wound was the sole cause of Russell's death. Such a wound would also cause a lot of blood to "be spurting out, if not spraying" throughout the area. However, pants might "muffle any spray." Seeing puddles or pools of blood in the area

where the wound was inflicted would be expected. On cross-examination, Peters stated a person most likely would have to be in the medical field to know how dangerous a wound to the femoral artery could be. He also testified not much force would be required to cause such a wound in a soft tissue area, but he recognized the knife had to also go through a pair of jeans.

¶ 14 The State presented multiple witnesses whose testimony showed the following events. Manea testified that, on December 14, 2019, he was at the house with Bushman and Manea's friend, Ioan Simandan. Bushman lived there, and Manea had an ownership interest in the property. In the late morning, defendant stopped by looking for Russell, but he was not there. Defendant returned with Russell in the afternoon, and the group listened to music, "did some BBQ," and drank beer. Nobody was drunk.

¶ 15 Bushman testified they needed steak knives to eat. Bushman kept his steak knives in a closed drawer. After dinner, defendant did the dishes and put everything away, and the drawer with the knives was closed. According to Bushman, during that time, Russell and defendant discussed defendant's relationship with a younger man, David Cross. Their voices were not raised, but Russell said he did not want defendant to be with Cross. Around 7 p.m., defendant left to return the truck she was driving. Russell and Bushman left to pick her up and then went to defendant's home. Meanwhile, Manea and Simandan went to sleep.

¶ 16 Bushman testified Cross was at defendant's house. A friend of Cross's showed up, and the group picked up another one of Cross's friends. When the group returned to Bushman's house, defendant, Russell, and Cross started arguing in the living room. Bushman saw "them" pick up Russell, "and then it looked like [defendant] pushed him down." The record is not clear who Bushman was referring to when he said "them."

¶ 17        Manea testified he had been sleeping on the living room couch and woke up around midnight when defendant, Russell, and three young people came into the house. Defendant and Russell were drunk and started to argue, with defendant raising her voice. Manea testified defendant tried to hit Russell with a bottle. Manea told everyone to leave, and they went outside onto the deck. Manea went to get Simandan, who was in a back room. As he did so, he heard defendant "screaming like crazy" and saying, "I'm going to kill you. I'm going to kill you. I'm going to kill you, very hard." Manea and Simandan left through the "other door," avoiding the people arguing on the deck. Manea never saw Russell hit or push defendant and never saw a physical altercation between the two. He also never saw a steak knife on the peninsula.

¶ 18        Bushman testified he left when Manea told everyone to leave, and Cross got in Bushman's car. From outside the home, Bushman could see there was some pushing and shoving going on back at the house and saw heads moving up and down, but a van was partially blocking the view. Cross's two friends were in or near the car. Cross then jumped out of the car and went up to the deck. Cross returned with defendant and they got in the car. After the group drove away, defendant said, "I think he is done," and "I stabbed him." She then wanted to go back and tried to jump out of the moving car. Defendant did not say much after that. Bushman waited to call 911 until later because he was afraid of the group.

¶ 19        Cross testified he began dating defendant when he was 18 years old and they dated for one to two years. However, at the time of Russell's death, he was no longer dating her. Cross was age 22 at the time of the trial. On December 14, 2019, Cross and his friends, Xavier Buhlman and Isaiah Moreno, went with defendant and Russell to Bushman's house. Cross could not remember if he had been drinking, but he recalled that Russell, defendant, and Bushman were intoxicated. Cross stated there was a "tense vibe going on the whole night." When they

arrived at the house, Russell was agitated and standing in front of Cross, intimidating him. Cross testified Russell was raising his voice and was about to hit him. When they were inside the house, Russell punched and pushed him. Defendant then jumped in front of Russell and said, "[D]on't hit the boys." Cross stated there was a scuffle and defendant got pushed back, but he could not remember the details. Cross testified Russell then came after him, and Cross ran out the door to the road. Cross started walking back toward the house and saw Russell hitting or punching defendant on the deck. No one else was on the deck. Cross continued to go closer to defendant, and Russell and Cross shoved a grill at Russell to get him to back away. Cross testified Russell "got like dizzy or something" and fell down on the deck. Cross then stepped in blood. He thought defendant was bleeding and shoved the grill toward Russell again, but Russell did not do anything. Cross then went to look for defendant because she had disappeared, but he did not go back inside the house.

¶ 20 Cross testified he found defendant coming out of the house and she was having what he referred to as "pass out spells." Cross got defendant to Bushman's vehicle. Cross heard defendant say she "killed her best friend." As they drove down the road, defendant said they had to go back and help Russell, and she tried to get out of the moving car. Bushman dropped off Buhlman and Moreno and then took Cross and defendant to defendant's home. Defendant said they could not stay there, so Cross and defendant went to an abandoned house owned by Cross's mother. Defendant told Cross she intended to turn herself in the next morning. The next morning, they went to McDonald's so defendant could use the Wi-Fi to contact her daughter to take her to the police station. However, the police found them at McDonald's before she could do so.

¶ 21       On cross-examination, Cross testified he had seen Russell angry and with bloody knuckles on a previous occasion. He also said Russell had twice threatened him with a knife earlier in the day on December 14, 2019. He admitted he had a history of confrontation with Russell. Cross knew Russell was a boxer, and Cross was afraid of him. He testified he did not want to fight with Russell and indicated he would run away instead of fight or use a weapon against him. Cross pushed the grill at Russell because he was afraid Russell was going to grab him. He felt he was defending himself and defendant. Cross never saw a knife during the incident and did not see defendant stab Russell. He did not call 911 that day because he did not have a phone.

¶ 22       Moreno testified Russell appeared to be drunk and became hostile toward him and Buhlman when they arrived at the home on the night of the incident. Russell grabbed or pushed both Moreno and Buhlman in the living room of the home. Defendant then stepped in front of them to protect them and asked Russell, "[W]ould you want someone to beat up your kids?" Moreno said Cross "was getting in [Russell's] face," telling him to not touch defendant. Moreno saw Russell hit defendant several times. Moreno heard Russell, defendant, and Cross yelling, and he heard Cross say "stop hitting her." He did not see any physical confrontation between Russell and Cross.

¶ 23       Moreno testified he and Buhlman left the house, went to Bushman's car, and saw Cross run to the road. Defendant was inside the house. He also saw defendant leave the home but then go back inside to get the rest of her alcohol. When defendant was in the car, she said she stabbed Russell and wanted to go back and help him. Moreno described her as "freaking out and passing out." He did not hear defendant say she killed Russell or that he was dead. Moreno initially testified he wanted to call 911, but Bushman said he would deal with it. On

cross-examination, he added Cross told everyone not to call the police and that Bushman would take care of it. When asked if he thought Cross could have stabbed Russell, Moreno said, "I don't think he would have it in him." Buhlman testified he saw Russell argue with Cross. He confirmed Cross ran out of the house to the road and testified he saw Russell push defendant.

¶ 24    Alexandria Deyo, a detective with the Whiteside County Sheriff's Office, was working as a deputy on December 15, 2019. On that date, Deyo was dispatched to look for defendant. Deyo located defendant at McDonald's, where defendant complained of pain on the right side of her face and jaw and said that she had a chipped tooth. Defendant told Deyo her best friend of many years attacked her and would not stop hitting her, and she stabbed him. Defendant did not say what she used to stab him.

¶ 25    Nate Macklin, an Illinois State Police sergeant, interviewed defendant. Charles Davidson, a master sergeant with the Illinois State Police, interviewed defendant the day after Macklin interviewed her. Video recordings of the interviews were played for the jury.

¶ 26    In the interviews, defendant explained Russell was her best friend. Defendant stated she had been drinking on the day of the incident but was not drunk. She described Cross as her boyfriend.

¶ 27    When asked about specifics of the incident, defendant said Russell yelled at everyone for walking in. Defendant said Russell was intoxicated. Defendant stated they were in the living room of the house, and Russell said he did not like Cross and threw a punch at him. Defendant got in between them, pushed them back, and told Cross to go outside. Defendant said she was "shocked" and "pissed" and asked Russell what he was doing. She told him, "[Y]ou don't hit the kids, we don't do that." Her next memory was Russell hitting her, and defendant indicated he was pushing her head down or had her in a headlock. She stated Russell punched

- 9 -

her jaw and she thought it was broken or dislocated. She said she could not see, reached back, grabbed something behind her, and "jabbed" Russell once in his outer thigh. She did not know what it was that she grabbed but said it seemed like it might have been a pencil. She insisted she jabbed Russell only one time, in the living room. Defendant said she was not trying to hurt Russell and instead was trying to get him to stop hitting her. Crying, she repeated on multiple occasions that she just wanted to shock Russell to make him stop and snap out of whatever was happening, which was out of character for him. She also said she thought he was going to keep punching her and she thought she was going to die. She said no one else was trying to stop him.

¶ 28        Defendant stated, after she jabbed Russell, he let her go and walked out onto the deck. She again stated numerous times she was positive the incident occurred in the living room. She next saw Russell leaning against the railing and then lying on the deck. Defendant crawled over to Russell, and he looked white. Defendant saw only a little bit of blood and did not see any pools of blood. Defendant testified she was then dragged off the deck. She did not know who pulled her off of the deck. She also said Cross would probably run away from a confrontation with Russell. In the second interview, she recounted a previous incident in which Russell threatened Cross and Cross ran away.

¶ 29        Defendant expressed confusion about what happened next or what happened to Russell. She could not remember full details but stated multiple times she had been dragged off the deck by someone and was confused about why she could not stay and help Russell, who was unconscious. She did not know or understand what caused him to become unconscious. She could not recall getting in Bushman's car. She also did not recall going back into the house. However, she remembered being in Bushman's car, asking to go back, and trying to get out of

the moving car, but Bushman told her Russell was fine. The next thing she remembered was being in her front yard.

¶ 30        Defendant recalled she next walked with Cross to his house. Cross and defendant went to McDonald's to use the Internet. Defendant called her daughter, who told her the police were looking for her. Defendant said she knew they were looking for her, but she needed to go to the hospital. Defendant's daughter came with the police, and defendant went to the police department and then to the hospital. Defendant said her jaw was not broken but she could not open her jaw very wide, she had broken teeth, a bump on the back of her head, bruises on her chest, hand, and arm, and her knee and ankle were injured. Although defendant pointed to purported bruises in one of the interviews, bruises were not visible in the video.

¶ 31        When told about the knife found on the peninsula, defendant said she did not know what she grabbed or what happened to it. When told the knife was likely what she used and asked if she agreed, she said she did. In the second interview, defendant acknowledged, based on what the officers told her the day before, that what she thought was a pencil at the time was actually the knife.

¶ 32        When the interviewing officers suggested the incident moved from the living room to the deck and that defendant "jabbed" Russell multiple times, she continued to insist the incident occurred entirely in the living room and she "jabbed" Russell only once. When asked if someone else was there who could have stabbed Russell, she said not that she could recall, but her memory was spotty. When officers suggested defendant was angry and followed Russell outside and stabbed him, she denied it and said she was not that type of person and would never do that. She also did not believe Russell dragged her out of the living room and onto the deck.

¶ 33 Defendant admitted there were parts of the incident she could not recall and, during the second interview, she stated it was possible Russell dragged her toward the deck during the incident. However, she repeated that was not her recollection, and she generally consistently insisted she did not stab Russell on the deck. She could not explain why witnesses saw her in an altercation with Russell on the deck.

¶ 34 Based on his interview with defendant, Davidson testified it was possible someone else used a knife to kill Russell. He also conceded it was possible defendant could not remember everything that happened because she may have suffered from blunt trauma to the head.

¶ 35 At the end of the State's case, defendant moved for a directed finding, arguing the State failed to prove beyond a reasonable doubt she caused Russell's death because no one saw defendant with a knife or saw her stab Russell. The trial court denied the motion.

¶ 36 Defendant presented evidence fingerprints were not taken from the inside of the house, from Russell's body, or from the knife. There were two DNA profiles found on the knife, one of which included Russell's profile. The other profile excluded defendant as a major contributor. A footprint in the blood on the deck was consistent with defendant's boot, but the investigator was unable to make a positive identification or elimination.

¶ 37 Dr. Bharat Raju testified he treated defendant at the hospital emergency room on December 15, 2019. Defendant reported she had been hit in her jaw, head, chest, and extremities multiple times. She complained of pain to the back of her head, chest, and jaw. Raju did not recall seeing any lumps or bruises. Defendant's jaw was not broken, but she had some chipped teeth. Raju testified he was unable to tell if the teeth were chipped recently. Raju prescribed defendant morphine for pain, which he testified was normally reserved for significant pain.

¶ 38        Alyshia Malott, a nurse, testified she also cared for defendant and noted defendant had ankle pain, bilateral knee bruises, chest and jaw pain, and she was confused and having memory disturbances. Defendant did not state she had stabbed or killed anyone.

¶ 39        Defendant did not offer any lesser-included offense instructions or a self-defense instruction. In closing arguments, defense counsel argued the State failed to prove defendant guilty beyond a reasonable doubt. Counsel noted no one saw defendant stab Russell, there was a lack of physical evidence such as fingerprints or DNA connecting defendant to the knife, and the police failed to take DNA or fingerprints from Cross. Counsel further argued defendant stated repeatedly in her interviews that she did not have a knife and never said she stabbed Russell with a knife. At most, she "jabbed" him once with an unknown object in the outer thigh. Counsel also argued defendant would not be strong enough to stab Russell in the inner thigh while he was beating her. Counsel also suggested, even if defendant did stab Russell with a knife, she did not intend for it to kill him or know the damage it could cause.

¶ 40        The jury found defendant guilty. Defendant's motion for a finding of acquittal or a new trial was denied.

¶ 41        At sentencing, the trial court reviewed the presentence investigation report and heard victim impact statements. Defendant declined to make a statement in allocution. The court sentenced defendant to 45 years' imprisonment. In doing so, the court discussed factors in mitigation and aggravation at length. The court stated it considered strong provocation as a mitigating factor but did not give it much weight. The court also found in mitigation the conduct was not likely to be repeated and defendant had a minimal criminal history, although the court noted she had numerous past traffic or petty offenses. In aggravation, the court found defendant left Russell to bleed to death knowing she had stabbed him, did not immediately contact the

police, and did not immediately go to the hospital despite her injuries. The court further noted defendant appeared generally calm in her police interviews. The court also noted the necessity for deterrence. Defendant's motion to reconsider the sentence was denied.

¶ 42       This appeal followed.

¶ 43                           II. ANALYSIS

¶ 44       On appeal, defendant contends (1) the State failed to prove her guilty of first degree murder beyond a reasonable doubt because it failed to prove she knew her acts created a strong probability of death or great bodily harm, (2) if the State sufficiently proved first degree murder, this court should reduce her conviction to second degree murder, (3) her counsel rendered ineffective assistance by failing to pursue theories of self-defense and the lesser-included offenses of involuntary manslaughter or second degree murder, and (4) her sentence was excessive.

¶ 45                       A. Sufficiency of the Evidence

¶ 46       Defendant first contends the State failed to prove her guilty of first degree murder beyond a reasonable doubt. She argues the Stated failed to prove when she grabbed an object and "jabbed" Russell, she knew such an act created a strong probability of death or bodily harm. Thus, she argues the State at most proved she was guilty of involuntary manslaughter based on reckless conduct.

¶ 47       A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

- 14 -

elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281, 903 N.E.2d 388, 406 (2009). The determination of the credibility of each witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the evidence is within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132, 718 N.E.2d 88, 111 (1999).

¶ 48            Here, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)), alleging defendant, without lawful justification, stabbed Russell multiple times with a knife, causing his death, while knowing her act created a strong probability of death or great bodily harm.

¶ 49            A defendant commits murder when the defendant's acts cause the death of the victim, and he or she "knows that such acts create a strong probability of death or great bodily harm to that individual." 720 ILCS 5/9-1(a)(2) (West 2018). A defendant acts with knowledge that the acts will cause a particular result when he or she "is consciously aware that that result is practically certain to be caused by his [or her] conduct." 720 ILCS 5/4-5(b) (West 2018).

¶ 50            A defendant commits involuntary manslaughter when he or she unintentionally kills an individual if the acts which cause the death "are likely to cause death or great bodily harm *** and he [or she] performs them recklessly." 720 ILCS 5/9-3(a) (West 2018). A person acts recklessly when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard constitutes a gross

deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018). Involuntary manslaughter is a lesser-included offense of first degree murder. *People v. Robinson*, 232 Ill. 2d 98, 105, 902 N.E.2d 622, 626 (2008).

¶ 51 Inferences concerning a defendant's mental state are a matter particularly within the province of the jury. *People v. Schmidt*, 392 Ill. App. 3d 689, 702, 924 N.E.2d 998, 1011 (2009). "Whether a defendant acted knowingly or intentionally 'may be inferred from the circumstances of the incident, defendant's conduct, and the nature and severity of the victim's injuries.' " *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 51, 67 N.E.3d 485. Further, while a defendant may act recklessly where he or she commits deliberate acts but disregards the risks of those acts, a voluntary and willful act that has the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than a reckless act. *Doolan*, 2016 IL App (1st) 141780, ¶ 51. In particular, when a defendant uses a deadly weapon upon a victim, it may be inferred the defendant intended to cause death. *People v. Koch*, 306 Ill. App. 3d 634, 637, 715 N.E.2d 290, 293 (1999). Even a small knife may be considered a deadly weapon. See *People v. Stanley*, 369 Ill. App. 3d 441, 445-46, 860 N.E.2d 343, 348 (2006). "A reviewing court must not substitute its judgment for that of the jury unless the inference of a mental state accepted by the jury was inherently impossible or unreasonable." *People v. Smith*, 149 Ill. 2d 558, 565, 599 N.E.2d 888, 891 (1992).

¶ 52 Here, despite defendant's assertions to the contrary, there was evidence she deliberately stabbed Russell multiple times with a knife on the deck. The cutlery drawer was completely pulled out of the counter and lying on the floor, indicating defendant pulled the drawer out to retrieve the knife. Multiple people then saw her arguing with Russell on the deck, refuting her story that Russell had her in a headlock in the living room. She was also heard

yelling she was going to kill Russell. Russell had multiple wounds, and the amount of blood on the deck compared to the lack of large amounts of blood in the house indicated Russell was stabbed on the deck. The bloody knife was ultimately located on a peninsula inside the house, indicating defendant then took the knife back inside and set it down after stabbing Russell. Those facts allowed the jury to infer defendant purposely obtained the knife and knowingly stabbed Russell with it on the deck instead of merely "jabbing" him once with some other object she grabbed from behind to get him to stop hitting her when they were inside. From there, the jury could reasonably infer defendant acted with knowledge that her acts were practically certain to cause either great bodily harm or death.

¶ 53 Defendant suggests she could not know a "jab" to the inner thigh would cause death and suggests, at most, the State proved she was guilty of involuntary manslaughter based on reckless conduct. However, the State was not required to prove specific knowledge of the danger of a stab to the femoral artery. It was enough for the State to prove she knew her acts created a strong probability of great bodily harm. Defendant used a knife with an approximately five-inch blade and was heard stating she would kill Russell, allowing the jury to infer defendant intended to cause death, an act that also encompasses knowledge that her acts were practically certain to cause either great bodily harm or death. Thus, the jury's finding of the mental state for first degree murder was not inherently impossible or unreasonable. Accordingly, the evidence was sufficient to convict defendant of first degree murder.

¶ 54 B. Request to Reduce Conviction

¶ 55 Defendant alternatively asks this court to reduce her conviction to second degree murder, arguing the evidence showed she acted under a sudden and intense passion resulting from serious provocation. She also suggests she believed she acted in self-defense.

¶ 56        A person is guilty of second degree murder when he or she commits the offense of first degree murder and at the time of killing he or she (1) is acting under a sudden and intense passion resulting from serious provocation by the individual killed or (2) believes the circumstances justify using self-defense, but the belief is unreasonable. *People v. Hayes*, 2022 IL App (4th) 210409, ¶¶ 55, 217 N.E.3d 327. "A defendant can be found guilty of second degree murder only if the State first proves all elements of first degree murder." *Hayes*, 2022 IL App (4th) 210409, ¶ 68. "The defendant then has the burden of proving a mitigating factor by the preponderance of the evidence." *Hayes*, 2022 IL App (4th) 210409, ¶ 68.

¶ 57        First, we note defendant forfeited this issue because she did not raise it during the trial or in her posttrial motion. *People v. Meras*, 284 Ill. App. 3d 157, 165, 671 N.E.2d 746, 752 (1996). Defendant never sought to prove either mitigating factor; instead, her theory was solely the State failed to prove first degree murder beyond a reasonable doubt. Defendant had the opportunity to pursue a conviction of a lesser-included offense at trial. "[H]aving refused to act on that opportunity, [defendant] cannot now be heard to argue that missed opportunity as a basis for the reduction of the degree of [her] conviction." *People v. Maxwell*, 89 Ill App. 3d 1101, 1104, 413 N.E.2d 95, 97 (1980).

¶ 58        To the extent defendant asks us to nevertheless ignore forfeiture and reduce her conviction, we note Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967) provides a reviewing court may reduce the degree of the offense for which the appellant was convicted and reduce the punishment imposed by the trial court. Illinois appellate courts have applied Rule 615(b)(3) under different formulations. "Some courts have held Rule 615(b)(3) applies only where the evidence is insufficient to prove an element of the offense beyond a reasonable doubt." *People v. Jones*, 286 Ill. App. 3d 777, 781, 676 N.E.2d 1335, 1338 (1997). Other decisions have

held Rule 615(b)(3) "extends beyond the general principle that a conviction will not be disturbed on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jones*, 286 Ill. App. 3d at 783, 676 N.E.2d at 1339.

¶ 59     The latter decisions have held the power to reduce the degree of the offense is available where there is (1) an evidentiary weakness in the State's case, (2) a mandatory minimum sentence that is unsatisfactorily harsh, and (3) a conviction for a lesser-included offense. See, *e.g.*, *People v. Godfrey*, 382 Ill. App. 3d 511, 513, 888 N.E.2d 1230, 1233 (2008) (Third District). See also *People v. Hooker*, 249 Ill. App. 3d 394, 403, 618 N.E.2d 1074, 1081 (1993) (First District); *People v. Hernandez*, 229 Ill. App. 3d 546, 552, 593 N.E.2d 1123, 1128 (1992) (Third District). However, even under the broader view of Rule 615(b)(3), a court may not reduce the degree of the offense "solely out of merciful benevolence [because] there must be some evidentiary weakness before a reviewing court will act." *People v. Jackson*, 181 Ill. App. 3d 1048, 1051, 537 N.E.2d 1054, 1056 (1989). In particular, the power to reduce a conviction of first degree murder to second degree murder should be cautiously exercised. *Hooker*, 249 Ill. App. 3d at 403, 618 N.E.2d at 1081.

¶ 60     Here, we will not reduce defendant's conviction under either approach. As previously noted, the State proved defendant guilty of first degree murder beyond a reasonable doubt. Even if we were to apply the broader view of Rule 615(b)(3), there was no asserted lesser-included offense because defendant purposely chose not to pursue that option. Further, the trial court did not express any concern or reluctance about the applicability of a mandatory minimum sentence. Instead, the court sentenced defendant to a term well above the minimum. Thus, we are not presented with circumstances under which a reduction of defendant's conviction is warranted.

¶ 61                    C. Ineffective Assistance of Counsel

¶ 62          Defendant next contends her counsel rendered ineffective assistance by failing to

pursue a theory of self-defense and failing to argue lesser-included offenses of second degree

murder or involuntary manslaughter applied.

¶ 63          Claims of ineffective assistance of counsel are governed by the standard set forth

in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23, 965

N.E.2d 1109. "To prevail on a claim of ineffective assistance of counsel, a defendant must show

both that counsel's performance was deficient and that the deficient performance prejudiced the

defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). A

defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either

prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d

302, 317-18, 939 N.E.2d 310, 319 (2010).

¶ 64          Counsel's effectiveness is determined by the totality of his or her conduct, and, as

a court of review, we will not inquire into areas involving the exercise of judgment, discretion,

trial tactics, or strategy. *People v. Edwards*, 301 Ill. App. 3d 966, 981, 704 N.E.2d 982, 994

(1998). There is a strong presumption counsel's conduct falls within the wide range of

reasonable professional assistance. *Strickland*, 466 U.S. at 689. "Indeed, strategic decisions are

virtually unchallengeable as long as the strategy was not so unsound that it failed to subject the

State's case to any meaningful adversarial testing." *People v. Dominguez*, 331 Ill. App. 3d 1006,

1014, 773 N.E.2d 1167, 1174 (2002).

¶ 65                    1. *Lesser-Included Offenses*

¶ 66          Counsel's decision as to what jury instructions to tender is one of several

determinations widely recognized as matters of trial strategy. *People v. Lowry*, 354 Ill. App. 3d

760, 766, 821 N.E.2d 649, 657 (2004). Further, a defense counsel's decision to advance an "all-or-nothing defense" has been recognized as a valid trial strategy. See *People v. Walton*, 378 Ill. App. 3d 580, 589, 880 N.E.2d 993, 1000-01 (2007) (citing cases). Such a strategy is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law. *Walton*, 378 Ill. App. 3d at 589, 880 N.E.2d at 1001. As the First District has explained:

> "The decision of whether to submit an instruction on a lesser-included offense is considered to be one of trial strategy, which has no bearing on the competency of counsel, who may strategize legitimately that it was better for the jury not to have the choice of the lesser-included offense in the hope that they would be more inclined to acquit. [Citations.] Merciful jurors may disregard even overwhelming proof of culpability and acquit entirely, or convict of a lesser crime than the evidence warrants; however, where lesser-offense instructions are given, a jury may be induced to find defendant guilty of the lesser offense rather than to continue the debate as to his innocence. [Citations.]" *People v. Benford*, 349 Ill. App. 3d 721, 728, 812 N.E. 2d 714, 720 (2004).

Thus, the decision whether to submit a lesser-included offense instruction is

> " 'a calculated risk on the part of defense counsel based on his or her assessment of the evidence and the perceived likelihood the jury will convict *** defendant *** rather than acquit altogether. If the instruction is given to a jury that would have chosen to acquit on the greater offense, then counsel has effectively subjected defendant to the risk of conviction on an uncharged offense when the client might otherwise have avoided any conviction. Alternatively, if defense counsel fails to request the instruction defendant may be found guilty of the

- 21 -

greater offense because the jury, in considering closely balanced evidence, believed it should find defendant guilty of a crime under the circumstances. It is these types of strategic calculations that a court will not second-guess.' " *Benford*, 349 Ill. App. 3d at 728, 812 N.E. 2d at 720-21 (quoting *People v. Brocksmith*, 162 Ill. 2d 224, 232-33, 642 N.E.2d 1230, 1234 (1994) (Freeman, J., concurring, joined by Bilandic, C.J.)).

¶ 67 We recognize the decision whether to request an instruction on a lesser-included offense belongs exclusively to defendant, as it is analogous to the decision of whether to plead guilty to a lesser charge. *Brocksmith*, 162 Ill. 2d at 229, 642 N.E.2d at 1232. However, when a lesser-included offense instruction was not tendered, we may assume defendant decided not to tender such instruction after due consultation with counsel. *People v. Medina*, 221 Ill. 2d 394, 409-10, 851 N.E.2d 1220, 1229 (2006).

¶ 68 Here, counsel pursued an all-or-nothing strategy based on the theory the State could not prove first degree murder. Defendant argues an all-or-nothing approach was unreasonable, but defendant's theory of the case was the State failed to prove she knew her acts were likely to cause great bodily harm or death or that she did not cause Russell's death. Those theories, while ultimately unsuccessful, had evidentiary support, and counsel fully subjected the State's case to meaningful adversarial testing. Defendant had repeatedly insisted to the police she "jabbed" Russell once inside the house with an object she thought was a pencil. She insisted she did not mean to harm him and only intended to shock him to make him stop hitting her. If believed, the jury could have found the State failed to prove she knew her acts were likely to cause great bodily harm or death and thus could have acquitted her of first degree murder. Meanwhile, no one actually saw defendant stab Russell. There was a lack of physical evidence

connecting defendant to the knife or the blood outside of the house, and Cross was present on the deck around the time of the incident. Thus, there was an inference that Cross actually stabbed Russell, which counsel reasonably suggested provided reasonable doubt of defendant's guilt. Therefore, counsel may have reasonably believed evidence supporting a lesser-included offense was insufficient, with the stronger argument being the State failed to prove first degree murder. See *Benford*, 349 Ill. App. 3d at 729, 812 N.E.2d at 721. Counsel may have also reasonably believed an instruction on lesser-included offenses might convert a likely acquittal into a likely conviction of the lesser crime. See *Dominguez*, 331 Ill. App. 3d at 1015, 773 N.E.3d at 1174-75. Regardless, it is not the function of the appellate court to second guess counsel on the matter. The record shows counsel's decision to not pursue lesser-included offenses was a matter of reasonable strategy. Counsel's strategy was unsuccessful, but otherwise legitimate. Thus, defendant was not denied effective assistance of counsel.

¶ 69                                    2. *Self-Defense*

¶ 70          We also find counsel's decision not to pursue self-defense a matter of strategy. "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224, 821 N.E.2d 307, 311 (2004).

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the

use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Lee*, 213 Ill. 2d at 225, 213 Ill. 2d at 311.

¶ 71 A criminal defendant is entitled to a self-defense jury instruction where any credible evidence whatsoever supports such a defense, no matter how slight. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56, 28 N.E.3d 923. However, the failure to request a self-defense instruction will not constitute ineffective assistance of counsel when such a failure was the result of trial strategy. See *People v. Haynes*, 408 Ill. App. 3d 684, 689, 946 N.E.2d 491, 497 (2011). More specifically, "it is counsel's decision, as a matter of trial strategy, whether to assert an affirmative defense of self-defense." *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40, 142 N.E.3d 722.

¶ 72 Here, counsel's decision to forgo arguing self-defense was a matter of trial strategy. As previously noted, counsel reasonably pursued an all-or-nothing trial strategy. Before trial, counsel specifically told the trial court the defense was not pursuing self-defense because defendant was not admitting she committed murder. Instead, the defense theory of the case was the State could not prove first degree murder beyond a reasonable doubt. Given defendant's unwillingness to admit she stabbed Russell, a self-defense approach was untenable. Further, there was evidence suggesting defendant may have been the aggressor and that she may have followed Russell onto the deck to stab him, drawing into question whether the use of force was necessary or if a danger actually existed. Counsel could have reasonably believed pursuing self-defense would require the defense to abandon the all-or-nothing strategy in favor of a less viable approach. Accordingly, defendant has not shown counsel rendered ineffective assistance.

¶ 73 D. Sentence

¶ 74        Defendant also contends the trial court erred in imposing a sentence of 45 years in prison. She argues the sentence was excessive, primarily because it amounted to a *de facto* life sentence.

¶ 75        A trial court has broad discretion in imposing a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448, 841 N.E.2d 889, 912 (2005). When a sentence falls within the statutory range of sentences possible for a particular offense, it is presumed reasonable. *People v. Moore*, 41 Ill. App. 3d 3, 4, 353 N.E.2d 191, 192 (1976). " 'In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed.' " *People v. Hestand*, 362 Ill. App. 3d 272, 281, 838 N.E.2d 318, 326 (2005) (quoting *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001)).

¶ 76        "Because the trial court is in a better position to observe the witnesses and consider the relevant factors, its sentencing determination is entitled to great deference." *People v. Kenton*, 377 Ill. App. 3d 239, 245, 879 N.E.2d 402, 407 (2007). " 'Absent an abuse of discretion by the trial court, a sentence may not be altered upon review.' " *People v. Hensley*, 354 Ill. App. 3d 224, 234, 819 N.E.2d 1274, 1284 (2004) (quoting *People v. Kennedy*, 336 Ill. App. 3d 425, 433, 782 N.E.2d 864, 871 (2002)). An abuse of discretion will be found "where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000)). Also, an abuse of discretion will not be found unless the court's sentencing decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26, 82 N.E.3d 693.

¶ 77    In this case, defendant was convicted of first degree murder, which carried a sentencing range of 20 to 60 years in prison. 730 ILCS 5/5-4.5-20(a) (West 2018). The trial court considered multiple factors in mitigation and aggravation and sentenced defendant to a term roughly in the middle of the sentencing range. Nothing in the record suggests the court erred in its description of the factors in mitigation or aggravation. It is true that, given defendant's age, a 45-year prison term is a *de facto* life sentence. However, it is not the rule that a defendant is entitled to be released once he or she is no longer a threat to society. Rather, in imposing a sentence, a trial court must strike a balance between rehabilitative potential and the seriousness of the offense. *People v. Murray*, 2020 IL App (3d) 180759, ¶ 33, 148 N.E.3d 235. The former does not necessarily take precedence over the latter. *Murray*, 2020 IL App (3d) 180759, ¶ 33. Indeed, "[t]he most important factor to consider is the seriousness of the crime." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44, 87 N.E.3d 353. Here, taking the seriousness of the crime into account, the court's sentencing decision was not arbitrary, fanciful, or unreasonable. Accordingly, it was not an abuse of discretion.

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we affirm the trial court's judgment.

¶ 80    Affirmed.